Eldon KLAASSEN, Plaintiff and
Counterclaim–Defendant
Below, Appellant,

v.

ALLEGRO DEVELOPMENT CORPO-
RATION, Raymond Hood, George Pat-
rich Simpkins, Jr. Michael Pehl, and
Robert Forlenza, Defendants and
Counterclaimants Below, Appellees.

No. 583, 2013.

Supreme Court of Delaware.

Submitted: Dec. 18, 2013.
Decided: March 14, 2014.

R. Judson Scaggs, Jr. (argued), Kevin M. Coen and Frank R. Martin, Esquires, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Of Counsel: George Parker Young, Anne Johnson and Kelli Larsen Walter, Esquires, Haynes and Boone, LLP, Fort Worth, Texas, for Appellant.

Peter J. Walsh, Jr., Ryan T. Costa, Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: Van H. Beckwith (argued), Jonathan R. Mureen, Jordan H. Flournoy, Esquires, Baker

Botts L.L.P., Dallas, Texas for Appellees Allegro Development Corporation, Raymond Hood, and George Patrich Simpkins, Jr., Lisa A. Schmidt, Jacob A. Werrett, Adrian D. Boddie, Esquires, Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Robert B. Lovett and Karen Burhans, Esquires, Cooley LLP, Boston, Massachusetts for Appellees Michael Pehl and Robert Forlenza.

Before HOLLAND, BERGER, JACOBS, and RIDGELY, Justices and JOHNSTON, Judge,* constituting the Court en Banc.

JACOBS, Justice:

## I. INTRODUCTION

Plaintiff-below/appellant Eldon Klaassen ("Klaassen") appeals from a Court of Chancery judgment in this proceeding brought under 8 *Del. C.* § 225. The judgment determined that Klaassen is not the *de jure* chief executive officer ("CEO") of Allegro Development Corporation ("Allegro"). Klaassen claimed that the remaining Allegro directors (collectively, the "Director Defendants"), in removing him as CEO, violated an equitable notice requirement and also improperly employed deceptive tactics. After a trial and without addressing its merits, the Court of Chancery held that the claim was barred under the equitable doctrines of laches and acquiescence.

We affirm the Court of Chancery judgment. We hold that, to the extent that Klaassen's claim may be cognizable, it is equitable in nature. Therefore, Klaassen's removal as CEO was, at most, voidable and subject to the equitable defenses of laches and acquiescence. We further conclude that the Court of Chancery properly found that Klaassen acquiesced in his removal as CEO, and is therefore barred from challenging that removal.[1]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts [2]

Allegro,[3] a Delaware corporation headquartered in Dallas, Texas, is a provider of energy trading and risk management software. From the time that Klaassen founded Allegro in 1984, he has been Allegro's CEO, and until 2007, owned nearly all of Allegro's outstanding shares.[4]

### (1) The Series A Investment

In 2007, at which time Allegro was valued at approximately $130 million, Klaassen and Allegro solicited capital infusions from prospective investors. As a result, Allegro entered into transactions with North Bridge Growth Equity 1, L.P. and Tudor Ventures III, L.P. (collectively, the "Series A Investors") in late 2007 and early 2008. In those transactions those investors received Series A Preferred Stock of Allegro in exchange for an investment of $40 million. Currently, the Series A Investors own all of Allegro's Series A Preferred Stock, and Klaassen holds the majority of Allegro's Common Stock. As

---

* Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Delaware Supreme Court Rules 2 and 4(a) to constitute the quorum as required.

1. For that reason we do not reach or decide the issue of whether Klaassen's claim is also barred under the equitable defense of laches.

2. This recitation of facts draws from the Court of Chancery's uncontested factual findings in its post-trial opinion.

3. Initially, Allegro was named Allegro Technology Corporation. In 1987, its name was changed to Allegro Development Corporation.

4. In 2000, Allegro issued stock options to certain Allegro employees.

part of that transaction the Series A Investors, together with Klaassen and Allegro, entered into a Stockholders' Agreement (the "Stockholders' Agreement"). In addition, Allegro amended and restated both its certificate of incorporation (the "Charter") and its bylaws (the "Bylaws").

Those three documents created a framework under which Klaassen and the Series A Investors would share control of Allegro's board of directors (the "Board"). Under the Bylaws, Allegro would be governed by a seven member Board. Under the Charter, the holders of Series A Preferred Stock (voting as a separate class) became entitled to elect three directors, and the holders of Common Stock (voting as a separate class) became entitled to elect one director. The remaining three directors would be elected as provided by Section 9.2 of the Stockholders' Agreement, under which Allegro's CEO would serve as a director, and in his capacity as CEO, would designate two outside directors, subject to the approval of the Series A Investors. The two outside directors would ultimately be elected by the holders of Series A Preferred Stock and Common Stock, voting together as a group.

Although the governing documents provided for a seven member Board, in actuality Klaassen and the Series A Investors settled on a five member Board. From 2010 until November 1, 2012, that Board consisted of Michael Pehl and Robert Forlenza (the "Series A Directors"), George Patrich Simpkins, Jr. and Raymond Hood

(the "Outside Directors"), and Klaassen (as the CEO director). During that period, Klaassen, as the majority common stockholder, did not elect a director, nor did the Series A Investors elect a third director.

In negotiating the terms of their investment, the Series A Investors also obtained certain guarantees regarding their eventual exit from Allegro, which was to occur in 2012. At any time after December 20, 2012, the Series A Investors could require Allegro to redeem all outstanding Series A Preferred shares. The redemption price would be the greater of: (i) the Fair Market Value (as defined in the Charter), or (ii) the original issue price, plus, in either case, any accrued or declared but unpaid dividends.[5] If the company were sold, the Series A Investors would receive an initial liquidation preference equal to two times their original $40 million investment, plus all unpaid accrued or declared dividends. The Series A Investors could not, however, force a sale of Allegro for less than $390 million without Klaassen's consent, so long as he held at least 33% of Allegro's outstanding capital stock.[6]

### (2) Events Leading To Klaassen's Termination

Not long after the Series A Investors became shareholders, Allegro began falling short of its financial performance projections.[7] A 2007 private placement memorandum circulated by Allegro had projected revenues of $61 million in 2008, $75 million in 2009, and $85 million in 2010.[8] In fact,

---

5. Section 6.5 of the Charter defined "Fair Market Value" as the "fair market value of ... Series A Preferred Stock ... determined in good faith by the Board of Directors and the holders of a majority of the then outstanding shares of Series A Preferred Stock. If the Board of Directors and the [Series A] holders ... are unable to do so ... [Allegro] shall engage an investment banking firm ... to calculate such fair market value." Charter, Part B § 6.5 (A84–85).

6. For more details of the Series A Investors' exit rights, see *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5739680, at *3 (Del.Ch. Oct. 11, 2013), *judgment entered*, 2013 WL 5726452 (Del.Ch. Oct. 18, 2013).

7. *Klaassen*, 2013 WL 5739680, at *3.

8. *Id.*

Allegro generated only $46 million in revenue in 2008, $37.5 million in 2009, and less than $35 million in 2010.[9] Although Allegro met its targets for the first three quarters of 2011, the company's fourth quarter performance was a "disaster," and the first quarter of 2012 was similarly disappointing.[10]

Not surprisingly, the Series A Directors, and later the Outside Directors, became discontented with Klaassen's performance as a manager. After the Series A investment transaction, Allegro hired Chris Larsen as chief operating officer to address the Series A Investors' concerns about Klaassen's management. Ten months later, Mr. Larsen resigned, citing difficulty working with Klaassen.[11] While Allegro's financial performance continued to falter, the Series A Directors became particularly frustrated with Klaassen's inability to provide the Board with accurate information.[12] In 2012, only four days before the end of Allegro's best sales quarter to date, Klaassen fired Allegro's senior vice president of sales—disregarding the Board's request to wait until after the quarter's end, and acting without any succession plan in place.[13] Finally, in September 2012, Allegro's chief marketing officer resigned, citing Klaassen's leadership style as the reason.[14]

As frustration with Klaassen mounted, in 2012 the Board began exploring ways to address the Series A Investors' redemption right.[15] At some point before the July 19, 2012 Board meeting, Klaassen proposed that Allegro buy out the Series A Investors' Preferred Stock investment for $60 million.[16] Initially the Series A Investors had demanded $92 million—the approximate value of their initial liquidation preference—but at a July 31, 2012 Board meeting they reduced their demand to $80 million.[17] At that same meeting, Klaassen made a presentation about Allegro's financial performance, apparently hoping to make his $60 million offer to the Series A Investors appear more attractive.[18] Instead, all that Klaassen accomplished was to highlight Allegro's poor performance as compared to its industry peers.[19] As a result, Mr. Forlenza (a Series A Director) concluded that the only viable path for the Series A Investors to achieve a profitable exit was to "grow" the company before exiting.[20]

### (3) Klaassen's Termination

In late summer 2012, the Board began seriously to consider replacing Klaassen as CEO. After the July 19 Board meeting, the Outside Directors discussed (with

9. *Id.* at *3, 4.

10. *Id.* at *4–5.

11. *Id.* at *3.

12. *Klaassen*, 2013 WL 5739680, at *4. In late 2010 and 2011, however, Klaassen showed "signs of improvement." *Id.*

13. *Id.* at *6.

14. *Id.* at *10.

15. *Id.* at *5. Klaassen maintained that he would not approve a third-party sale to facilitate the Series A Investors' exit unless that sale generated at least $100 million for him personally. *Id.* at *7.

16. *Id.* at *6. Klaassen obtained an appraisal from CBIZ Valuation Group, LLC that valued the Series A Preferred shares at $39 to $47 million. *Id.* He later obtained a second appraisal from Duff & Phelps that valued the Series A Preferred shares at $54 million. *Id.* at *6 n. 1.

17. *Klaassen*, 2013 WL 5739680, at *5–7.

18. *Id.* at *8.

19. *Id.*

20. *Id.* The Series A Investors could not force a full redemption of their shares if Allegro did not have legally available funds. *Id.* at *5.

Klaassen), Klaassen's unwillingness to compromise with the Series A Investors. Mr. Hood pointedly told Klaassen that with three director votes, the Board could remove him as CEO.[21] After Klaassen's July 31 Board meeting presentation, Messrs. Pehl and Forlenza (the Series A Directors) became more convinced that Klaassen had to be replaced.[22] In an August 7, 2012 conference call, Messrs. Pehl, Forlenza, Hood, and Simpkins discussed the possibility of replacing Klaassen.[23] Shortly after that call, Mr. Hood asked Baker Botts LLP (legal counsel for the Outside Directors) for advice about the ramifications of replacing Klaassen.[24] On August 17, 2012, the Director Defendants spoke once again.[25]

In mid-September 2012, Messrs. Simpkins and Hood met with Klaassen. Both warned Klaassen that his tenure as CEO was "in jeopardy."[26] At some point, most likely in September, Mr. Pehl asked Mr. Hood whether he (Hood) would consider replacing Klaassen as CEO. Eventually, Hood agreed,[27] and by mid-October, the four Director Defendants (Pehl, Forlenza, Hood, and Simpkins) decided to replace Klaassen at the next regularly scheduled Board meeting on November 1, 2012.[28] Those four directors held two preparatory conference calls—on October 19 and October 26—and asked Baker Botts to prepare a draft resolution removing Klaassen as CEO.[29] The Director Defendants decided not to forewarn Klaassen that they planned to terminate him, because they were concerned about how Klaassen would react while still having access to Allegro's intellectual property, bank accounts, and employees.[30]

On November 1, 2012, before the Board meeting, Mr. Hood emailed Klaassen, asking if Chris Ducanes, Allegro's general counsel, could attend the Board meeting to discuss the Series A redemption issue. Klaassen agreed. Mr. Hood later admitted that that email was "false" because, in fact, Mr. Ducanes' presence was needed to implement Klaassen's termination immediately after Klaassen was informed.[31]

All five directors attended the November 1, 2012 Board meeting. Also attending were Messrs. Ducanes, and Jarett Janik, Allegro's chief financial officer.[32]

21. *Id.* at *7. Klaassen immediately confirmed with Allegro's general counsel that the Board had the power to terminate Klaassen. *Id.*

22. *Klaassen,* 2013 WL 5739680, at *8. The Series A Directors had at earlier times considered replacing Klaassen, but after the July 2012 Board meetings, the Series A Directors believed the Outside Directors might also support Klaassen's replacement. *Id.*

23. *Id.*

24. *Id.*

25. *Id.*

26. *Id.* at *9–10. During his dinner with Klaassen, Simpkins advised Klaassen on what he needed to do to remain CEO. *Id.* at *9. In September, Klaassen re-confirmed with Allegro's general counsel and outside counsel (Gibson Dunn & Crutcher LLP) that the Board had the authority to terminate Klaassen as CEO. *Id.*

27. *Klaassen,* 2013 WL 5739680, at *9.

28. *Id.* at *10–11. The November 1 meeting was originally scheduled for October 18, but was rescheduled, first for October 25, then November 1.

29. *Id.* at *11.

30. *Id.* Klaassen suggests that he was given no notice of the removal plans because the Director Defendants were concerned that he (Klaassen) would pre-empt those plans by changing the composition of the Board. Appellant's Op. Br. at 11.

31. *Klaassen,* 2013 WL 5739680, at *11. The Court of Chancery found that the email had no effect on Klaassen's attendance of the Board meeting.

32. *Id.*

Toward the end of the meeting, the Director Defendants asked Messrs. Ducanes, Janik, and Klaassen to leave the room to allow the Director Defendants to meet in executive session.[33] During the executive session, the Director Defendants confirmed their decision to remove and replace Klaassen.[34] They then recalled Messrs. Ducanes and Janik, and informed them that Mr. Hood would be replacing Klaassen as CEO.[35] Thereafter, Klaassen returned to the meeting, at which point Mr. Pehl informed Klaassen that the Board was removing him as CEO.[36] The Board then voted on the resolution (prepared by Baker Botts) that removed Klaassen and appointed Hood as interim CEO,[37] with the Director Defendants voting in favor and Klaassen abstaining.[38]

### (4) Post–Termination Events

After his removal as CEO, Klaassen initially offered to help Mr. Hood learn about the industry and Allegro's operations. In early to mid-November 2012, Klaassen also began negotiating the terms of a consulting agreement, under which he would serve as an "Executive Consultant" to Allegro, reporting to Allegro's CEO. The draft consulting agreement expressly precluded Klaassen from holding himself out to third parties as an Allegro employee or agent.[39] In early December 2012, Klaassen communicated to Mr. Simpkins, that

he (Klaassen), in his capacity as a director and common shareholder, would hold Hood "accountable" as CEO for Allegro's performance, and that if Allegro's performance did not improve, the "management change should be judged a failure." [40]

At a Board meeting held in early December, Klaassen raised the issue of Hood's continued membership on the audit committee, given the bylaw requirement that Allegro employees could not serve on the audit committee.[41] Thereafter, Klaassen circulated a written consent that would remove Hood from the audit committee and appoint Klaassen to the audit and compensation committees. On December 29, 2012, all five directors executed a revised written consent removing Mr. Hood from the audit committee and appointing Klaassen to the audit and compensation committees. As a member of the compensation committee, Klaassen provided feedback on Mr. Hood's employment agreement, and also participated in vetting candidates for Hood's future management team.

In late 2012, Klaassen began expressing displeasure about his termination as CEO.[42] In an email Hood sent in late November 2012, Hood remarked that "Eldon has not accepted his fate." [43] On November 29, 2012, Klaassen emailed ExxonMobil (a major Allegro client), informing Exx-

33. *Id.*

34. *Id.*

35. *Id.*

36. *Klaassen,* 2013 WL 5739680, at *11.

37. *Id.*

38. *Id.*

39. The negotiations, however, halted, and the parties never entered into the consulting agreement. *Klaassen,* 2013 WL 5739680, at *12.

40. Email from George Patrich Simpkins, Jr. to Eldon Klaassen (Dec. 4, 2012, 15:27) (B95–96).

41. The Bylaws also prohibited Allegro employees from serving on the compensation committee.

42. *Klaassen,* 2013 WL 5739680, at *12.

43. Email from Michael Pehl to Raymond Hood (Nov. 28, 2012, 10:09) (A240–42).

on that Allegro was in the midst of a "bitter" shareholder dispute and that the company had become "dysfunctional."[44] Klaassen also began hosting events for Allegro employees, at which he criticized Allegro management and spread rumors of other employee terminations.[45]

On June 5, 2013, Klaassen sent a letter to Messrs. Ducanes, Pehl, and Forlenza, claiming that his (Klaassen's) removal as CEO was invalid. Klaassen also delivered two written consents (in his capacity as majority shareholder) that purported to: (i) remove Messrs. Simpkins and Hood as outside directors; (ii) elect John Brown as the common director; and (iii) elect Dave Stritzinger and Ram Velidi as outside directors.

## B. The Court Of Chancery Decision

On June 5, 2013, Klaassen filed an action in the Court of Chancery under 8 *Del. C.* § 225 for a declaration that: (i) Klaassen was the lawful CEO of Allegro; (ii) Messrs. Simpkins and Hood had been effectively removed as Allegro directors; and that (iii) Messrs. Brown, Stritzinger and Velidi had been validly elected as Allegro directors.[46] Klaassen challenged his removal as CEO on two separate grounds. First, he claimed that a majority of the Director Defendants had breached their fiduciary duty of loyalty by firing him.[47] Second, Klaassen claimed that his November 1, 2012 termination was invalid, because the Director Defendants did not give him advance notice of (and employed de-

ception in carrying out) their plan to terminate him before holding the November 1 Board meeting.[48]

The Director Defendants defended, on the merits, the validity of Klaassen's removal as CEO. They also raised the equitable defenses of laches and acquiescence, claiming that under either or both doctrines Klaassen was barred from challenging his removal.

After a trial and post-trial briefing, the Court of Chancery issued a memorandum opinion on October 11, 2013, holding that because Klaassen's challenge to his removal as CEO was grounded in equity, that challenge was subject to the Director Defendants' equitable defenses.[49] The court further found that Klaassen's challenge was barred by the equitable doctrines of laches and acquiescence.[50] Finally, the court determined that Klaassen had validly removed Mr. Simpkins and had validly elected Mr. Brown, but that his removal of Mr. Hood and the election of Messrs. Stritzinger and Velidi were legally invalid.[51]

On October 23, 2013 Klaassen appealed to this Court from that judgment, and moved for expedited scheduling, which this Court granted on October 24, 2013. On November 7, 2013, the Court of Chancery issued a "Status Quo Opinion," continuing in effect part of the pre-trial status quo order in force during the pendency of the Chancery litigation.[52]

44. *Klaassen*, 2013 WL 5739680, at *12.

45. *Id.*

46. *Klaassen*, 2013 WL 5739680, at *1, 13.

47. *Id.* at *13. Specifically he claimed that Pehl and Forlenza were improperly motivated by the Series A Investors' desire to exit Allegro, and that Hood was improperly motivated by his desire to become Allegro's CEO.

48. *Id.* at *14.

49. *Id.* at *19.

50. *Id.* at *20.

51. *Id.* at *1. Those findings are not at issue in this appeal.

52. *Klaassen v. Allegro*, Del.Ch., C.A. No. 8626, Laster, V.C., 2013 WL 5967028 (Nov. 7, 2013) (Mem.Op.).

## III. THE PARTIES' CONTENTIONS AND STANDARD OF REVIEW

### A. The Contentions On Appeal

Klaassen claims that the Court of Chancery reversibly erred in finding that he was barred by the equitable doctrines of laches and acquiescence from challenging his removal as CEO. Specifically, Klaassen argues that in effecting his removal, the Director Defendants gave him no advance notice of their plans to remove him at the November 1, 2012 Board meeting and, moreover, employed deception in calling that meeting, all in violation of "core Delaware corporate law precepts." [53] As a consequence, (Klaassen urges), his removal as CEO was void (as distinguished from voidable), and as a result his challenge to that removal was not subject to equitable defenses. Klaassen further claims that because the Director Defendants violated the Bylaws by not giving Klaassen notice of special meetings held in advance of the November 1 Board meeting, his removal as CEO was void on that ground as well. Finally, Klaassen claims that even if his removal was only voidable, the Court of Chancery erred in finding that Klaassen's claim was barred under the doctrines of laches and acquiescence.

### B. The Issues And The Standard Of Review

Klaassen's challenge to his removal rests on two separate claims of wrongdoing by the Director Defendants: first, the lack of advance notice to Klaassen of their plan to terminate him; and second, the use of deception in carrying out that plan. The first claim requires us to decide whether

Klaassen's claim—that the Director Defendants were required to give him advance notice of their plan to remove him as CEO at the November 1 Board meeting—is cognizable under Delaware law. We conclude that it is not. The remaining two issues relate solely to Klaassen's "deception" claim. They are: (1) whether Klaassen's deception-based claim is subject to equitable defenses, and (2), if so, whether that claim is barred by the doctrines of laches and/or acquiescence.

■ This Court reviews questions of law de novo. [54] We will not overturn the Court of Chancery's factual findings unless they are clearly erroneous. [55] A trial court's application of equitable defenses presents a mixed question of law and fact. [56]

## IV. ANALYSIS

### A. The Director Defendants Did Not Violate Any Notice Requirements

#### (1) No Notice Required For Regular Board Meeting

■ Klaassen claims that the Board's action to remove him as CEO taken at the November 1 meeting was invalid, because he (Klaassen) received no advance notice that his possible termination would be considered at that meeting. This claim lacks merit. Klaassen was terminated at a regular meeting of Allegro's Board. It is settled Delaware law that corporate directors are not required to be given notice of regular board meetings. [57] There being no such notice requirement, it follows that there is no default requirement that directors be given advance notice of the specific agenda items to be addressed at a

---

**53.** Appellant's Op. Br. at 2.

**54.** *DV Realty Advisors LLC v. Policemen's Annuity & Ben. Fund of Chicago,* 75 A.3d 101, 108 (Del.2013).

**55.** *Id.*

**56.** *Poliak v. Keyser,* 2013 WL 1897638, at *2 (Del. May 6, 2013).

**57.** *Lippman v. Kehoe Stenograph Co.,* 95 A. 895, 898 (Del.Ch.1915); 4 Fletcher Corp. Forms § 22:93 (5th ed.).

regular board meeting.[58] Nor do any notice provisions of Allegro's Bylaws override that default rule. Therefore, the Director Defendants violated no default rule of Delaware law, or any provision of Allegro's Bylaws, by not giving Klaassen advance notice of their plan to terminate him at the November 1 regular Board meeting.

### (2) Klaassen's Contrary Arguments

■ Klaassen contends that four Court of Chancery decisions—*Koch v. Stearn*,[59] *VGS, Inc. v. Castiel*,[60] *Adlerstein v. Wertheimer*,[61] and *Fogel v. U.S. Energy Systems, Inc.*[62]—establish the rule that a director who also is a shareholder or officer of a corporation is entitled to advance notice of any matter to be considered at a board meeting, that may affect that director's specific interests. Three of those cases (*Koch, Adlerstein,* and *Fogel*) involved corporations,[63] and in those cases the disputed board actions all occurred at

---

**58.** *See* 1 R. FRANKLIN BALOTTI & JESSE A. FINKELSTEIN, THE DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 4.8[A] (3d ed. 2014). A director defendant's duty of care may limit the actions he may take at a regular meeting. *See, e.g., Smith v. Van Gorkom,* 488 A.2d 858, 872–73 (Del.1985), *overruled on other grounds by Gantler v. Stephens,* 965 A.2d 695 (Del. 2009).

**59.** 1992 WL 181717 (Del.Ch. July 28, 1992), *vacated by Stearn v. Koch,* 628 A.2d 44 (Del. 1993). *Koch* involved the removal, by the corporation's board at a special meeting, of a corporation's CEO (Stearn) who also held a majority of the corporation's common stock. The Court of Chancery (in a decision vacated by this Court) held that Stearn's removal was void because the notice of the special meeting was silent as to any possible consideration of Stearn's removal as CEO, thereby depriving Stearn of the opportunity to protect himself by changing the composition of the board (as the controlling shareholder) before the special meeting.

**60.** 2000 WL 1277372 (Del.Ch. Aug. 31, 2000). *VGS* involved a dispute between the managers of an LLC—Sahagen, who controlled 25% of the LLC's member interests, and Castiel, who controlled the remaining 75%. By non-unanimous written consent (as permitted by the LLC's operating agreement), two of the LLC's three managers (including Sahagen) effected a merger with a new Delaware corporation that essentially reversed Sahagen's and Castiel's ownership interests—without notice to Castiel. The Court of Chancery held that by effecting the merger without giving advance notice to Castiel (who could· have removed one of the managers approving the merger),

the managers violated their duty of loyalty to Castiel, and the merger was therefore invalid.

**61.** 2002 WL 205684 (Del.Ch. Jan. 25, 2002). *Adlerstein* involved a corporate board's approval, at a special meeting, of an investment proposal that issued preferred stock to an outside investor and thereby deprived one of the corporation's directors (Adlerstein) of voting control in his capacity as a corporate shareholder. Adlerstein was given no advance notice that the investment proposal would be presented or voted on at that meeting. The Court of Chancery held that the board's approval of the investment proposal "must be undone" because the failure to give Adlerstein advance notice of the investment proposal amounted to "trickery" and precluded Adlerstein from pre-empting the board's action by removing (in his capacity as a stockholder) the other corporate directors.

**62.** 2007 WL 4438978 (Del.Ch. Dec. 13, 2007). *Fogel* involved the purported removal (at a special meeting of the corporation's board) of a corporation's CEO (Fogel), who was vested with the authority to call a special meeting of the corporation's shareholders. The Court of Chancery held that no board meeting had actually taken place, and therefore the removal was ineffective. Alternatively, the court held that by not giving Fogel notice of the planned termination, the remaining directors tricked Fogel into attending the special meeting. In so doing, the court explained, the directors prevented Fogel from exercising his right to call a special shareholder meeting where the shareholders could have removed those directors adverse to Fogel.

**63.** *VGS* involved a limited liability company. ·

special—not regular—board meetings.[64] Those decisions, therefore, do not support Klaassen's claim.[65] *VGS* is likewise inapplicable. *VGS* involved a limited liability company ("LLC"). Two of the LLC's three managers had acted by non-unanimous written consent with no prior notice to the third manager. The effect of the challenged action was to deprive the third manager (in his capacity as an LLC member) of his majority ownership interest in the LLC. *VGS* is distinguishable factually from the circumstances presented here, and we view its holding as limited to its facts.

■ Next Klaassen argues that the Director Defendants failed to give him advance notice of multiple special meetings held before the November 1 regular Board meeting. That failure (Klaassen argues) violated both Allegro's Bylaws and Delaware law requiring advance notice for special meetings. This argument is unavailing, because (as the Court of Chancery found) the complained-of action—Klaassen's termination—did not occur at any pre-November 1 "special meetings." Rather, it occurred at the November 1 regular meeting of Allegro's Board.[66] Although the Director Defendants may have discussed and prepared to terminate Klaassen before the November 1 meeting, they took no official Board action until they voted on the termination resolution at that meeting.[67] For these reasons, Klaassen's advance notice claim fails.

## B. Klaassen's Deception Claim Is Barred By Acquiescence

■ We turn next to Klaassen's deception-based claim, and uphold the Vice Chancellor's determination that that claim is barred by the equitable doctrine of acquiescence. Klaassen's claim that he was deceived by the Director Defendants during the November 1 Board meeting is equitable in nature. That being the case, any Board action that violated the Board's equitable obligations would be at most voidable and, as such, subject to equitable defenses. Lastly, we conclude that the Court of Chancery correctly found that Klaassen acquiesced in his removal as Allegro's CEO. Because a finding of acquiescence is sufficient to uphold the Court of Chancery's judgment, we do not reach or address the separate issue of whether Klaassen's claim is also barred by laches.

### (1) Klaassen's Deception Claim Implicates Board Action That Is Voidable, Not Void

■ Klaassen claims that the Board action removing him as CEO at the No-

---

**64.** Unlike with regular meetings, directors must be given notice of special meetings. *See Lippman*, 95 A. at 898 ("It is, of course, fundamental that a special meeting held without due notice to all the directors is not lawful. . . .").

**65.** The Court of Chancery, in its November 7, 2013 Status Quo Opinion, questioned whether the holdings in *Koch et al.* are in fact good law. We need not respond to that question, as an answer is not required to resolve this case.

**66.** *Klaassen*, 2013 WL 5739680, at *3. Klaassen does not explicitly argue that that finding was clearly erroneous.

**67.** Klaassen's reliance on *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, 1998 WL 71836 (Del.Ch. Feb. 4, 1998) is misplaced. *Moore* involved a formal board resolution adopted at a special meeting from which one director was absent because he had received no notice. Thereafter, at a second special meeting (with the excluded director in attendance) the board purported to ratify its earlier resolution. The Court of Chancery held that the board action could not be ratified because it was undertaken at a special meeting of which one director had no notice. That is not this case. Here, the Allegro Board did not take any official action to terminate Klaassen until the November 1 regular meeting, at which Klaassen was present.

vember 1 meeting was invalid, because the Director Defendants employed deceptive tactics—namely, offering false reasons for rescheduling that meeting, and providing a false explanation for Mr. Ducanes' presence at that meeting. Our courts do not approve the use of deception as a means by which to conduct a Delaware corporation's affairs, and nothing in this Opinion should be read to suggest otherwise.[68] Here, however, we need not address the merits of Klaassen's deception claim, because we find, as did the Court of Chancery, that Klaassen acquiesced in his removal as CEO.

■ Klaassen challenges his removal as a violation of "generally accepted notions of fairness."[69] A claim of that kind is equitable in character.[70] A fundamental principle of our law is that "he who seeks equity must do equity."[71] Consequently, a plaintiff's equitable claim against a defendant may be defeated, in a proper case, by the plaintiff's inequitable conduct towards that defendant.[72] It follows that board action taken in violation of equitable principles is voidable, not void, because "[o]nly voidable acts are susceptible to . . . equitable defenses."[73]

This result is congruent with the well-established distinction between void and voidable corporate actions. As this Court discussed in *Michelson v. Duncan*,[74] "[t]he essential distinction between voidable and void acts is that the former are those which may be found to have been performed in the interest of the corporation but beyond the authority of management, as distinguished from acts which are *ultra vires*, fraudulent or gifts or waste of corporate assets."[75]

---

**68.** *See, e.g., Schnell v. Chris–Craft Indus., Inc.*, 285 A.2d 437, 439 (Del.1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

**69.** Plaintiff's Opening Pre–Trial Brief, at 27 (A2246); *see also Adlerstein*, 2002 WL 205684, at *9 (noting that claim rested on the "basic requirement of our corporation law that boards of directors conduct their affairs in a manner that satisfies minimum standards of fairness"). Klaassen's effort on appeal to characterize his claim as grounded in fundamental corporate law precepts does not alter the equitable nature of his claim.

**70.** *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1077–78 (Del.Ch.2004), *aff'd sub nom., Black v. Hollinger Int'l Inc.*, 872 A.2d 559 (Del.2005) ("[T]here are two types of corporate law claims. The first is a legal claim, grounded in the argument that corporate action is improper because it violates a statute, the certificate of incorporation, a bylaw or other governing instrument, such as a contract. The second is an equitable claim, founded on the premise that the directors or officers have breached an equitable duty that they owe to the corporation and its stockholders."); *see also Pepsi–Cola Bottling Co. v. Woodlawn Canners, Inc.*, 1983 WL 18017, at *13 (Del.Ch. Mar. 14, 1983) ("The inequitable use of an otherwise legal right can be made

subject to redress."). To the extent that Klaassen's deception claim stems from alleged fiduciary duty violations, it is also equitable in nature. *See QC Commc'ns Inc. v. Quartarone*, 2013 WL 1970069, at *1 (Del.Ch. May 14, 2013) ("[The complaint] states a claim for breach of fiduciary duty, an equitable claim—perhaps *the* quintessential equitable claim.").

**71.** *Welshire, Inc. v. Harbison*, 91 A.2d 404, 408 (Del.1952).

**72.** *Id.*

**73.** *Boris v. Schaheen*, 2013 WL 6331287, at *15 (Del.Ch. Dec. 2, 2013); *see also Diamond State Brewery v. De La Rigaudiere*, 17 A.2d 313, 318 (Del.Ch.1941) (explaining that if a stock issuance is "merely voidable, 'then that form of relief is to be adopted which would seem to be most in accord with all the equities of the case' "); *cf. Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del.1990) (explaining that an equitable defense has no application where a board action is void).

**74.** 407 A.2d 211 (Del.1979).

**75.** *Id.* at 218–19. In its opinion in this case, the Court of Chancery formulated a new rule

Klaassen contends, nonetheless, that the rule in Delaware is otherwise, because *Koch, VGS, Adlerstein,* and *Fogel* dictate that a board action carried out by means of deception is *per se* void, not voidable.[76] Klaassen's argument finds arguable support in the language of those decisions. Regrettably, in writing those opinions, the authors may have been less than precise in their use of the terms "void" and "voidable." In *Fogel* and *Koch,* for example, the court stated that where deception is employed in the course of a board meeting, any action taken thereat is "void."[77] Yet, in both opinions, the court implicitly acknowledged that the infirm board action was curable if the aggrieved director acquiesced by participating in the board meeting.[78] The disconnect between the use of the term "void" and the acknowledgement that the deceptive action was curable (and, thus, voidable), renders these cases infirm as precedent on this specific issue. To the extent that those decisions can fairly be read to hold that board action taken in violation of an equitable rule is void, however, we overrule them.

### (2) Klaassen Acquiesced In His Removal As CEO

■■■■ Finally, having determined that Klaassen's deception claim is voidable and properly subject to equitable defenses, we address whether the Court of Chancery correctly found that Klaassen's claim was barred by the doctrine of acquiescence. We conclude that the court correctly so found. A claimant is deemed to have acquiesced in a complained-of act where he:

has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved.[79]

For the defense of acquiescence to apply, conscious intent to approve the act is not required,[80] nor is a change of position or resulting prejudice.[81]

Klaassen does not claim that he lacked full knowledge of either his rights or the material facts. Accordingly, the narrow question is whether Klaassen's conduct amounted, in the eyes of the law, to recog-

---

distinguishing between void and voidable board acts: "The foregoing authorities suggest that Delaware law distinguishes between (i) a failure to give notice of a board meeting in the specific manner required by the bylaws and (ii) a contention that the lack of notice was inequitable. In the former scenario, board action taken at the meeting is void. In the latter scenario, board action is voidable in equity, so equitable defenses apply." *Klaassen,* 2013 WL 5739680, at *19. We need not approve or disapprove that rule, because such a broad pronouncement is not necessary to decide this case.

76. *See Fogel,* 2007 WL 4438978, at *4 ("[D]eception render[ed] the meeting and any action taken there void.").

77. *Id.* at *4; *Koch,* 1992 WL 181717, at *5.

78. *Fogel,* 2007 WL 4438978, at *3; *Koch,* 1992 WL 181717, at *5; *see also Adlerstein,* 2002 WL 205684 (using the terms "void" and "voidable"); *VGS,* 2000 WL 1277372 (using the term "invalid").

79. *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 582 (Del.Ch.1998) (quoting *The NTC Group, Inc. v. West Point–Pepperell, Inc.,* 1990 WL 143842, at *5 (Del.Ch. Oct. 17, 1990)).

80. *Frank v. Wilson & Co.,* 9 A.2d 82, 87 (Del. Ch.1939), *aff'd,* 32 A.2d 277 (Del.1943).

81. *Nevins v. Bryan,* 885 A.2d 233, 254 (Del. Ch.2005), *aff'd,* 884 A.2d 512 (Del.2005) (citing *Wilson & Co.,* 32 A.2d at 283); *Balin v. Amerimar Realty Co.,* 1996 WL 684377, at *20 (Del.Ch. Nov. 15, 1996); *Papaioanu v. Commissioners of Rehoboth,* 186 A.2d 745, 749 (Del.Ch.1962).

nition and acceptance of his removal as Allegro's CEO. We hold that it did. Shortly after his removal, Klaassen (without protest) helped Mr. Hood transition to his new role as CEO. Klaassen also negotiated a consulting agreement (which never came into effect) providing that he would report to Allegro's CEO and that Klaassen would not hold himself out as an Allegro employee or agent. Later, Klaassen proclaimed that he would hold Mr. Hood (as CEO) responsible for Allegro's performance, commented on Hood's employment contract, executed a written consent removing Hood from the audit committee due to Hood's role as CEO, and served as a compensation committee member. Whatever may have been Klaassen's subjective intent, his conduct objectively evidenced that he recognized and accepted the fact that he was no longer Allegro's CEO.

Klaassen points to factual circumstances that (he says) negate the trial court's determination of acquiescence. Klaassen claims that he warned of possible litigation when presenting a proposal to purchase the Series A Preferred shares.[82] But, what he warned of was *shareholder* litigation, and that warning was made within the context of negotiations between Klaassen and the Series A Investors to purchase the Series A Preferred Stock. Indeed, during that very presentation, Klaassen acknowledged that on November 1, 2012, Allegro had hired Hood as its CEO. Klaassen also contends that the negotiation of his consulting agreement (which was never approved) was merely a ploy to remain involved in Allegro while he was negotiating the Series A Preferred share repurchase. But, Klaassen does not substantiate that *ipse dixit* claim, and, moreover, his "conscious intent" is immaterial to an acquiescence finding.

Klaassen also emphasizes Hood's remark, when the negotiations broke down, that Klaassen had not "accepted his fate." Although that vague statement shows that Klaassen was unhappy about his termination, it does not clearly or persuasively evidence that Klaassen was contesting the validity of the removal. Lastly, Klaassen claims that the Director Defendants never relied on Klaassen's written consent appointing him to the audit and compensation committees, from whose meetings the Director Defendants excluded him. Klaassen misapprehends the significance of that written consent. Whether or not Klaassen actively participated in the audit and compensation committees' activities, the executed written consent constituted an official, formal acknowledgment that he (Klaassen) was no longer Allegro's CEO and that Hood had succeeded him in that office.[83] The Court of Chancery correctly determined that Klaassen acquiesced in his removal as CEO.

## V. CONCLUSION

For the foregoing reasons, the Court of Chancery judgment is affirmed. Jurisdiction is not retained.

---

82. Klaassen also claims that he told Allegro employees that he was still CEO. The only record citation he provides for this claim, however, is to his own trial testimony.

83. Klaassen also attempts to distinguish factually his case from two cases cited by the Court of Chancery—*Papaioanu*, 186 A.2d 745, and *Nevins*, 885 A.2d 233. Any factual differences between those cases and this case do not preclude a finding of acquiescence here.