# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ERNESTO ESPINOZA, derivatively on behalf of FACEBOOK, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 9745-CB |
| MARK ZUCKERBERG, SHERYL K. SANDBERG, DONALD E. GRAHAM, PETER A. THIEL, MARC L. ANDREESSEN, REED HASTINGS, ERSKINE B. BOWLES, and SUSAN D. DESMOND-HELLMANN, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| FACEBOOK, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## OPINION

Date Submitted: July 28, 2015
Date Decided: October 28, 2015

Kathaleen St. J. McCormick and Nicholas J. Rohrer of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Brian J. Robbins, Felipe J. Arroyo and Jenny L. Dixon of ROBBINS ARROYO LLP, San Diego, California; *Attorneys for Plaintiff.*

David E. Ross and S. Michael Sirkin of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendants and Nominal Defendant.*

**BOUCHARD, C.**

This case presents a question of first impression: Can a disinterested controlling stockholder ratify a transaction approved by an interested board of directors, so as to shift the standard of review from entire fairness to the business judgment presumption, by expressing assent to the transaction informally without using one of the methods the Delaware General Corporation Law prescribes to take stockholder action? In my opinion, the answer to this question is no. Stated in the affirmative, I conclude for the reasons explained below that stockholder ratification of a self-dealing transaction must be accomplished formally by a vote at a meeting of stockholders or by written consent in order to shift the standard of review that otherwise would apply to such a transaction.

In this derivative action, a stockholder of Facebook, Inc. challenges the decision of Facebook's board of directors in 2013 to approve compensation for its outside, non-management directors, who comprised six of the eight directors on Facebook's board at the time. The stockholder asserts claims against the defendant directors for breach of their fiduciary duties, unjust enrichment, and waste of corporate assets.

The parties agree that the board's decision to approve the 2013 compensation would be governed by the entire fairness standard of review in the first instance as a self-dealing transaction. After the filing of this lawsuit, however, Mark Zuckerberg, who did not receive the disputed 2013 compensation and who controlled over 61% of the voting power of Facebook's common stock, expressed his approval of the 2013 compensation for the non-management directors in a deposition and an affidavit. Based on these sworn statements, the defendants seek summary judgment against the fiduciary duty and unjust enrichment claims on the theory that Zuckerberg, in his capacity as a disinterested

1

stockholder, ratified the 2013 compensation, thereby shifting the standard of review governing that transaction from entire fairness to the business judgment presumption. Defendants also seek to dismiss the waste claim for failure to state a claim upon which relief can be granted.

The fundamental issue here is whether Zuckerberg's approvals were in a form sufficient to constitute stockholder ratification. Zuckerberg did not make use of a formal method of expressing stockholder assent, namely by voting at a stockholder meeting or acting by written consent in compliance with Section 228 of the Delaware General Corporation Law. According to plaintiff, stockholder ratification may be invoked only by one of these two methods. Defendants counter that it is sufficient that Zuckerberg, acting as a disinterested controlling stockholder, expressed his will to approve the transaction even if he did not adhere to corporate formalities.

The controlling stockholder of a Delaware corporation wields significant power, including the power in some circumstances to ratify interested directors' decisions and thereby limit judicial scrutiny of such actions. But a controlling stockholder should not, in my view, be immune from the required formalities that come with such power. Although traditional agency law allows a principal to ratify an agent's conduct through informal assent, this tradition is ill-suited to the context of corporate law ratification, where formal structures govern the collective decision-making of stockholders who coexist as principals. These formalities serve to protect the corporation and all of its stockholders by ensuring precision, both in defining what action has been taken and establishing that the requisite number of stockholders approved such action, and by

2

promoting transparency, particularly for non-assenting stockholders.  I therefore conclude that stockholders of a Delaware corporation—even a single controlling stockholder—cannot ratify an interested board's decisions without adhering to the corporate formalities specified in the Delaware General Corporation Law for taking stockholder action.

Given this conclusion, the entire fairness standard applies to the board's approval of the 2013 compensation.  As such, and given that defendants have not thus far demonstrated that the directors' compensation decisions were entirely fair, their motion for summary judgment is denied.  Plaintiff has failed to state a reasonably conceivable claim for waste, however, and thus that claim is dismissed.

## I.    BACKGROUND[1]

### A.    The Parties

Nominal Defendant Facebook, Inc. ("Facebook" or the "Company") is a Delaware corporation with headquarters in California.  Hundreds of millions of people use Facebook's social networking website and mobile applications.  Facebook has a dual-class capital structure.  Its Class B common stock has ten votes per share and its Class A common stock has one vote per share.

Defendant Mark Zuckerberg is the founder of Facebook.  Zuckerberg has served as Facebook's Chief Executive Officer since July 2004 and as the Chairman of Facebook's board of directors since January 2012.  Zuckerberg, principally due to his ownership of the super-voting Class B shares, controlled approximately 61.6% of the

---

[1] Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Verified Complaint, the parties' submitted affidavits, and the exhibits thereto.

3

total voting power of Facebook's common stock as of February 28, 2014.[2]  Defendant Sheryl K. Sandberg has served as Facebook's Chief Operating Officer since March 2008 and as a Facebook director since June 2012.

Defendants Donald E. Graham, Peter A. Thiel, Marc. L. Andreessen, Reed Hastings, Erskine B. Bowles, and Susan D. Desmond-Hellmann were members of Facebook's board of directors when the Verified Complaint was filed on June 6, 2014, and at all times relevant to this opinion.  All of the defendant directors other than Zuckerberg and Sandberg were non-employee directors.

Plaintiff Ernesto Espinoza alleges he has been a Facebook stockholder at all relevant times.

## B.      Facebook Adopts the 2012 Equity Incentive Plan

Since 2008, Facebook has granted restricted stock units ("RSUs") to new members of its board of directors who were not Facebook investors or employees.[3]  Beginning in 2011, new non-employee directors typically received 20,000 RSUs upon joining the board, and an annual retainer of $50,000.  From 2011 until mid-2013, the Audit Committee Chair received an extra $20,000.

In a prospectus filed before Facebook's initial public offering, Facebook announced that its board of directors and stockholders had adopted the 2012 Equity Incentive Plan, which became effective upon filing the prospectus in May 2012, and

---

[2] Sirkin Aff. Ex. 12 (Facebook 2014 Definitive Proxy Statement), at 36 (filed March 31, 2014).

[3] Zuckerberg Aff. ¶ 3.

4

which replaced the 2005 Stock Plan.[4]   The 2012 Equity Incentive Plan authorizes Facebook's board of directors to provide stock-based compensation to Facebook's employees, officers, directors, and consultants.[5]   The Compensation Committee of Facebook's board administers the 2012 Equity Incentive Plan, except for grants to non-employee directors, which are determined by the full board.[6]   The 2012 Equity Incentive Plan caps awards at 2,500,000 shares of Facebook stock per individual recipient per year and 25,000,000 shares (plus certain adjustments and additional shares from prior award programs) for the entire program.[7]   New employees are eligible to receive up to 5,000,000 shares in their first year of employment.[8]

## C.    The Board Approves Compensation for Non-Employee Directors

On August 21, 2013, the Compensation Committee, consisting of Graham and Thiel, discussed the compensation of Facebook's non-management directors.[9]   The following day, Facebook's board considered the topic at a regular meeting and unanimously approved a proposal to increase the annual cash retainer paid to Audit Committee members from $50,000 to $70,000, to raise the annual cash retainer paid to

---

[4] Sirkin Aff. Ex. 7 (Facebook Prospectus (Form 424B4)), at 134 (filed May 18, 2012).

[5] *Id.* at 135.

[6] Compl. ¶ 16; Sirkin Aff. Ex. 18 (Exhibit 10.4 to Facebook Prospectus) § 4.1.

[7] Compl. ¶ 16; Sirkin Aff. Ex. 18 (Exhibit 10.4 to Facebook Prospectus) §§ 2.1, 3.

[8] *Id.* § 3.

[9] Sirkin Aff. Ex. 20 (Facebook Compensation Committee Meeting Minutes, Aug. 21, 2013) ¶ 11.

the Audit Committee Chair from $70,000 to $100,000, and to provide non-employee directors with annual RSU grants at a value of $300,000 per year, subject to the board's approval of an implementation plan.[10] Zuckerberg attended this meeting.[11] A few weeks later, the Facebook board formally approved a plan implementing the proposal by unanimous written consent.[12]

As a result of the board's approval of the compensation plan, Facebook's six non-employee directors received RSU grants in 2013 (the "2013 Compensation"). In fiscal year 2013, Graham, Thiel, Andreessen, Hastings, and Bowles each received 7,742 RSUs with a grant date fair value of $387,874.[13] Desmond-Hellmann, who joined Facebook's board in March 2013, received 27,742 RSUs with a grant date fair value of $935,874.[14] The difference in her compensation level was due to the 20,000 RSUs she received upon joining Facebook's board in 2013. Plaintiff does not allege that employee directors Sandberg or Zuckerberg received any compensation for their board service.

---

[10] Sirkin Aff. Ex. 21 (Facebook Board of Directors Meeting Minutes, Aug. 22, 2013) ¶ 13.

[11] *Id.* at 1.

[12] Sirkin Aff. Ex. 22 (Action by Unanimous Written Consent of the Board of Directors of Facebook, Sept. 13, 2013).

[13] Compl. ¶¶ 8-12.

[14] Compl. ¶ 13.

### D. Procedural Posture

On June 6, 2014, plaintiff filed a derivative complaint on behalf of Facebook against the eight members of its board of directors concerning the 2013 Compensation. The complaint asserts three causes of action: breach of fiduciary duty "for awarding and/or receiving excessive compensation at the expense of the Company" (Count I), waste of corporate assets (Count II), and unjust enrichment (Count III).[15] Each of these claims is asserted against all eight members of the board. Plaintiff does not distinguish any of his claims against Zuckerberg and Sandberg even though they did not receive any of the 2013 Compensation, and defendants have submitted collective briefing that generally treats the directors as a unit.[16] Thus, for purposes of this motion, the claims will be analyzed without making any distinction between the two inside directors (Zuckerberg and Sandberg) and the six non-employee directors.[17]

Plaintiff did not make a demand on Facebook's board before filing this action, alleging that demand was excused because, among other reasons, six of the eight members of the board received the challenged compensation and thus derived a personal

---

[15] Compl. ¶¶ 26-37.

[16] Defendants distinguish Zuckerberg by focusing on his interests as a *stockholder* to argue that the 2013 Compensation was ratified by a disinterested majority of stockholders. Defs.' Op. Br. 27-29.

[17] *See Sample v. Morgan*, 914 A.2d 647, 669 (Del. Ch. 2007) (grouping insider directors and other directors together for purposes of motion to dismiss because the "directors [had] not tried to distinguish themselves," while acknowledging that directors must be assessed individually in any potential future findings of liability).

benefit from the transaction at issue in this case.[18]  In the face of these allegations, defendants have not asserted any defense under Court of Chancery Rule 23.1 for failure to make a demand.

On August 18, 2014, defendants moved for summary judgment under Court of Chancery Rule 56 on Counts I and III, the claims for breach of fiduciary duty and unjust enrichment.  They also moved to dismiss Count II, the waste claim, under Court of Chancery Rule 12(b)(6).[19]  On the same day, Zuckerberg filed an affidavit in support of the summary judgment motion declaring as follows:

> 10. Regardless of the capacity in which I have considered the issue, my view of the compensation of Facebook's Non-Executive Directors has never changed.  I approve of all 2013 equity awards to Facebook's Non-Executive Directors, as well as Facebook's plan for compensation of Non-Executive Directors going forward (pursuant to the Annual Compensation Program). . . .

> 11. Although I was never presented with an opportunity to approve formally the 2013 equity awards to Facebook's Non-Executive Directors or the Annual Compensation Program in my capacity as a Facebook stockholder, had an opportunity presented itself, I would have done so.  If put to a vote, I would vote in favor of the 2013 equity awards to Facebook's Non-Executive Directors, as well as the Annual Compensation Program, and if presented with a stockholder written consent approving them, I would sign it.[20]

On February 18, 2015, plaintiff deposed Zuckerberg.  During his deposition, Zuckerberg testified as follows regarding Facebook's board of directors:

---

[18] Compl. ¶¶ 23-24.

[19] Defs.' Mot. Summ. J.

[20] Zuckerberg Aff. ¶¶ 10-11.

8

These are the people who I want and – and who I think will serve the company best, and I think that the compensation plan that we have is doing its job of attracting and retaining them over the long term.[21]

Zuckerberg never executed a written consent under 8 *Del. C.* § 228, which would have triggered an obligation to notify non-consenting stockholders of the action taken.[22]

On July 28, 2015, I heard oral argument on defendants' motions to dismiss and for summary judgment.

## II. LEGAL ANALYSIS

### A. Legal Standard

Under Court of Chancery Rule 56, the Court shall grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[23] The Court must assess "whether the evidence, when viewed in the light most favorable to the nonmoving party, presents any dispute of material fact."[24] "If a rational trier of fact could find any material fact that would favor the non-moving party in a determinative way . . ., summary judgment is inappropriate."[25]

Under Court of Chancery Rule 12(b)(6), the Court will only dismiss for failure to state a claim upon which relief can be granted if "plaintiff could not recover under any

---

[21] Zuckerberg Dep. 63:7-11, Feb. 18, 2015.

[22] 8 *Del. C.* § 228(e).

[23] Ct. Ch. R. 56(c).

[24] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[25] *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002).

reasonably conceivable set of circumstances susceptible of proof."[26] In making such a determination, the Court will "accept all well-pleaded factual allegations in the Complaint as true . . . ."[27]

I first address Counts I and III, the claims for breach of fiduciary duty and for unjust enrichment, against which defendants seek summary judgment. I then address Count II, the claim for waste of corporate assets, which defendants seek to dismiss.

### B.    Count I:  Breach of Fiduciary Duty

Plaintiff asserts in Count I that defendants violated their fiduciary duty of loyalty "by awarding and/or receiving" the 2013 Compensation, thereby causing injury to Facebook.[28]  Plaintiff argues that the entire fairness standard must apply to this transaction because six of the eight board members received the 2013 Compensation, and thus a majority of the board was interested in the transaction.  A brief review of some basic legal principles, the applicability of which is not disputed, frames the parties' key point of disagreement.

Directors are necessarily interested in their compensation, which is a benefit they receive that does not accrue to stockholders generally.[29]  Thus, where, as here, directors

---

[26] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[27] *Id.*

[28] Compl. ¶¶ 27-28.

[29] *See Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) ("A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.").

make decisions about their own compensation, those decisions presumptively will be reviewed as self-dealing transactions under the entire fairness standard rather than under the business judgment rule.[30] A decision dominated by interested directors can gain the protection of the business judgment rule, however, if a fully-informed disinterested majority of stockholders ratifies the transaction.[31] At that point, the doctrinal standard of review becomes one of waste.[32]

Here, defendants contend that the business judgment rule should apply to their approval of the 2013 Compensation on the theory that Zuckerberg, who indisputably holds a majority of the voting power of Facebook's common stock, and who did not receive any of the 2013 Compensation, ratified the 2013 Compensation in his capacity as a Facebook stockholder by virtue of statements he made in his affidavit and his

---

[30] *See Telxon*, 802 A.2d at 265 ("Like any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation."); *Seinfeld v. Slager*, 2012 WL 2501105, at *12 (Del. Ch. June 29, 2012) ("While the Defendant Directors may be able to show that the amounts they awarded themselves are entirely fair, their motion to dismiss must be denied with respect to [a compensation-related claim].").

[31] *See Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *7-9 (Del. Ch. June 26, 2014) (reviewing cases and holding that directors' self-interested equity awards fell under business judgment presumption due to approval by a disinterested majority of stockholders, and finding that relevant proxy statements were not materially misleading); *Steiner v. Meyerson*, 1995 WL 441999, at *7 (Del. Ch. July 19, 1995) (Allen, C.) (applying business judgment presumption to self-interested transaction because stockholders had approved stock option compensation plan at annual meeting).

[32] *See Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 587 (Del. Ch. 2015) (compiling authorities).

11

deposition after this action was filed.[33]  Plaintiff responds that these acts do not constitute a valid form of stockholder ratification (and thus do not permit invocation of the business judgment rule) because Zuckerberg did not express assent as a stockholder in a manner permitted by the Delaware General Corporation Law ("DGCL").[34]  Before considering the authorities on which defendants rely, I review the provisions of the DGCL governing the taking of stockholder action.

### 1. The Methods for Taking Stockholder Action Under the DGCL

The DGCL provides two methods for stockholders to express assent on a matter concerning the affairs of the corporation:  (1) by voting in person or by proxy at a meeting of stockholders, or (2) by written consent.  In both cases, the statute contains a number of formal requirements that, with the reinforcement of this Court's precedents, ensure precision in stockholder voting and transparency to all stockholders.

Before 1937, with limited exceptions,[35] stockholders of Delaware corporations could express assent only by voting in person or by proxy at a meeting of stockholders.[36]

---

[33] Defs.' Reply Br. 4 ("Defendants rely exclusively upon Mr. Zuckerberg's actions as a stockholder (*i.e.*, his affidavit and deposition) to establish ratification."); Defs.' Reply Br. 9 ("In both his sworn affidavit and his deposition, Mr. Zuckerberg specifically 'approve[d] of all 2013 equity awards to Facebook's Non-Executive Directors . . . .'").

[34] Pl.'s Ans. Br. 27-30.  Regarding the additional ratification requirements that the ratifying stockholders be fully informed and disinterested, plaintiff appears to dispute the latter but not the former.  Pl.'s Ans. Br. 36-37.  Because I determine that Zuckerberg did not use an appropriate method to express assent in order to ratify the disputed compensation, I do not address whether he was fully informed and disinterested.

[35] For instance, stockholders could act by unanimous written consent to dissolve the corporation.  *See* An Act Providing a General Corporation Law, 21 Del. Laws ch. 273,

The DGCL presently contemplates that Delaware corporations will hold annual meetings of stockholders and permits the holding of special meetings of stockholders.[37] "Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, . . . and, in the case of a special meeting, the purpose or purposes for which the meeting is called."[38] Such notice must be provided in writing to stockholders entitled to vote at the meeting "not less than 10 nor more than 60 days before the date of the meeting . . . ."[39] Under Delaware law, moreover, directors have a duty to disclose to stockholders material information concerning any matter on which they are asked to vote.[40]

---

§ 34 (1899) ("Whenever all the stockholders shall consent in writing to a dissolution, no meeting or notice thereof shall be necessary . . . .").

[36] *See* S. Samuel Arsht, *A History of Delaware Corporation Law*, 1 Del. J. Corp. L. 1, 11-12 (1976) (discussing the first adoption of unanimous written consents by the Legislature in 1937).

[37] 8 *Del. C.* § 211(c) (Court of Chancery may summarily order that meeting of stockholders be held upon the application of any director or stockholder when, among other events, no date has been designated for a period of thirteen months after the last annual meeting); 8 *Del. C.* § 211(d) ("Special meetings of the stockholders may be called by the board of directors or by such person or persons as may be authorized by the certificate of incorporation or by the bylaws.").

[38] 8 *Del. C.* § 222(a).

[39] 8 *Del. C.* § 222(b).

[40] *See Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding that directors are required to provide, with complete candor, "information such as a reasonable shareholder would consider important in deciding whether to" tender shares); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944-45 (Del. 1985) (applying *Lynch v. Vickers*

To ensure accurate recordkeeping of actions taken at stockholder meetings, the DGCL specifically requires every Delaware corporation to have one officer with "the duty to record the proceedings of the meetings of the stockholders and directors in a book to be kept for that purpose."[41] The corporation also must prepare a list of stockholders entitled to vote in a given meeting, which list must be open to examination by any stockholder for any purpose germane to the meeting.[42] Corporations with publicly traded securities, moreover, must appoint an inspector to determine the number of shares outstanding and represented at a stockholders meeting, and to tabulate the results of any votes that take place at the meeting.[43]

In 1937, the DGCL was amended to permit stockholders to approve by unanimous written consent any action that was required to be taken, or that could be taken, at an

---

disclosure standard to stockholders' decision to vote for a merger); *In re Anderson, Clayton S'holders Litig.*, 519 A.2d 680, 689-90 (Del. Ch. 1986) ("It is established by our law that one element of the fiduciary duty that directors of a Delaware corporation owe to shareholders is the duty to provide full and honest disclosure of material facts relating to any transaction that requires shareholder approval.").

[41] 8 *Del. C.* § 142(a). Notably, this is the only duty of an officer that is specifically set forth in the statute. Otherwise, the duties of officers are left to "be stated in the bylaws or in a resolution of the board of directors . . . ." *Id. See also* 8 *Del. C.* § 211(a)(2)(b)(iii) ("[I]f any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the corporation.").

[42] 8 *Del. C.* § 219(a).

[43] 8 *Del. C.* § 231(a)-(b). This requirement does not apply to companies that are unlisted and have 2,000 stockholders or fewer. 8 *Del. C.* § 231(e).

annual or special meeting of stockholders.[44]  In 1967, the statute was further amended to remove the unanimity requirement for companies that chose to waive the requirement in their certificate of incorporation.[45]  In 1969, non-unanimous consent became the default rule rather than an option requiring an enabling charter provision.[46]  Although taken for granted now, non-unanimous written consent troubled the prominent drafter of the 1967 revision of the DGCL, who saw the potential for abuse.[47]  Today, under Section 228 of the DGCL, unless the certificate of incorporation restricts the use of written consents, any action that may be taken at any annual or special meeting of stockholders may be taken by majority stockholder consent (or whatever other voting threshold applies for a particular act) "without a meeting, without prior notice and without a vote."[48]

---

[44] 41 Del. Laws ch. 131, § 6 (1937) ("Whenever the vote of stockholders at a meeting thereof is required or permitted to be taken in connection with any corporate action, by any Section of this Chapter, the meeting and vote of stockholders may be dispensed with, if all of the stockholders who would have been entitled to vote upon the action if such meeting were held, shall consent in writing to such corporate action being taken . . . .").

[45] 56 Del. Laws ch. 50, § 228 (1967); 1 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 228.08, at 7-340 (6th ed.).

[46] 57 Del. Laws ch. 148, § 16 (1969).

[47] *See* Ernest L. Folk, III, *Corporation Law Developments—1969*, 56 Va. L. Rev. 755, 783 (1970) ("It is apparent that this procedure can be abused where a large block of stock is held in a conveniently small number of hands.  It permits the control block to take action in virtual secrecy and then present the minority shareholders with a *fait acompli* when it fulfills the minimal state statutory obligation of giving them 'prompt' notice of the action taken.").

[48] 8 *Del. C.* § 228(a).

Significantly, although Section 228 permits stockholders to take action by written consent without prior notice, "[p]rompt notice of the taking of the corporate action" by written consent must be provided to the non-consenting stockholders.[49] Thus, Section 228 ensures some level of transparency for non-consenting stockholders. Indeed, this Court has refused to make a written consent effective under Section 228 when the consenting stockholders failed to provide the required prompt notice to the non-consenting stockholders, until the failure to provide notice was remedied.[50]

This Court has recognized more broadly that, "[b]ecause Section 228 permits immediate action without prior notice to minority stockholders, the statute involves great potential for mischief and its requirements must be strictly complied with if any semblance of corporate order is to be maintained."[51] In that vein, the Delaware Supreme Court has held that the statute must be "given its plain meaning," which requires adherence to the condition that "any corporate action taken under [Section] 228 is effective only upon the delivery of the proper number of valid and unrevoked consents to

---

[49] 8 *Del. C.* § 228(e). Delaware courts have not precisely defined the scope of disclosure required by this notification obligation. *See Dubroff v. Wren Holdings, LLC*, 2011 WL 5137175, at *9 (Del. Ch. Oct. 28, 2011) ("[T]he precise parameters of the disclosure required by § 228(e) have not yet been delineated"); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *37 (Del. Ch. Sept. 4, 2014) (discussing disclosure principles under 8 *Del. C.* § 228(e) "[w]ithout rigidly defining the scope of information that must be disclosed").

[50] *See Di Loreto v. Tiber Holding Corp.*, 1999 WL 1261450, at *5 (Del. Ch. June 29, 1999).

[51] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013) (internal quotation marks omitted).

the corporation."[52] This Court also has recognized the need for strict compliance with the ministerial requirements of Section 228, such as the dating of the consent by each consenting stockholder.[53] Thus, even if a controlling stockholder manifests a clear intent to ratify a decision outside of a stockholder meeting, the ratification will not be effective unless it complies with the technical requirements of Section 228.

In sum, the provisions of the DGCL governing the ability of stockholders to take action, whether by voting at a meeting or by written consent,[54] demonstrate the importance of ensuring precision, both in defining the exact nature of the corporate action to be authorized, and in verifying that the requirements for taking such an action are met, including that the transaction received enough votes to be effective. They also

---

[52] *Allen v. Prime Computer, Inc.*, 540 A.2d 417, 420 (Del. 1988). *See also* 8 *Del. C.* § 228(a) ("[Consents] shall be delivered to the corporation by delivery to its registered office in [Delaware], its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.").

[53] *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 152 (Del. Ch. 2003) (refusing to dismiss claim that consents were invalid because the consents were not individually dated, and "the date requirement set forth by Section 228(c) must be strictly enforced"); *Carsanaro*, 65 A.3d at 641 (holding that stockholder must possess the exhibits incorporated by reference into consent in order for that stockholder's consent to be valid under Section 228).

[54] The recently adopted Section 204 provides another example of formalities required for stockholder action. This provision permits validation of otherwise defective corporate acts through board ratification and stockholder approval. 8 *Del. C.* § 204. When their approval is required, stockholders must receive notice twenty days before the stockholder meeting to approve the defective act, and the notification must include all relevant information regarding the defective act and the directors' resolution to ratify it. *Id.* § 204(d). The defective act is only ratified upon completion of this process. *Id.* § 204(f)-(h).

demonstrate the importance of providing transparency to stockholders, whose rights are affected by the actions of the majority. In particular, stockholders have the right to participate in a meeting at which a vote is to be taken after receiving notice and all material information or, in the case of action taken by written consent, to receive prompt notice after the fact of the action taken.

### 2. Defendants' Authorities Are Inapposite and Do Not Warrant Deviation from the Corporate Formalities of the DGCL

Defendants argue that Zuckerberg, as Facebook's controlling stockholder, should be permitted to ratify the decision of an interested board of directors without complying with the formalities of the provisions of the DGCL for taking stockholder action. According to defendants, Zuckerberg's expressions of assent to the 2013 Compensation in his deposition and in his affidavit are each sufficient to ratify that transaction and shift the judicial standard of review from one of entire fairness to business judgment.

Defendants advance several arguments in an attempt to make this case, beginning with reliance on general principles of ratification under the law of agency.[55] In particular, defendants assert that Chancellor Allen's decision in *Lewis v. Vogelstein*[56] affirms the applicability of common law ratification in the corporate context.

---

[55] In agency law, "[r]atification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Restatement (Third) of Agency* § 4.01 (2006). When effective, "ratification retroactively creates the effects of actual authority." *Id.* § 4.02.

[56] 699 A.2d 327 (Del. Ch. 1997).

In *Vogelstein*, stockholders challenged certain option grants made under a stock option compensation plan for the directors of Mattel, Inc., which plan had been approved by the stockholders of the company at an annual meeting. Because the challenged transaction had been approved at a formal meeting of stockholders, the Court had no occasion to consider the question presented here, to wit, whether assent expressed outside the mechanisms prescribed by the DGCL can form the basis for a valid act of stockholder ratification. The Court's inquiry focused instead on the legal effect of a concededly valid form of stockholder ratification on judicial review of the option grants in question.[57] In analyzing this question, Chancellor Allen explained how "[r]atification is a concept deriving from the law of agency," but went on to elaborate that "[a]pplication of these general ratification principles to shareholder ratification is complicated by three other factors," namely (1) the lack of a single individual acting as principal—a factor not present here, (2) a purpose to demonstrate compliance with fiduciary duties rather than to validate unauthorized conduct, and (3) the existence of the DGCL as a statutory overlay.[58] The Chancellor commented that these "differences between shareholder

---

[57] After explaining the diverging views on this issue at the time, Chancellor Allen expressed his view that "informed, uncoerced, disinterested shareholder ratification of a transaction in which corporate directors have a material conflict of interest has the effect of protecting the transaction from judicial review except on the basis of waste." 699 A.2d at 336.

[58] *See Lewis v. Vogelstein*, 699 A.2d at 335.

ratification of director action and classic ratification by a single principal . . . lead to a difference in the effect of a valid ratification in the shareholder context."[59]

I do not read *Vogelstein* as a wholesale endorsement of importing general principles of common law ratification into the corporate context, as defendants suggest. To the contrary, the decision demonstrates the need to be sensitive to the peculiarities of the corporate context when applying general principles of ratification. To the list of complicating factors Chancellor Allen identified in *Vogelstein*, I would add that deviation from the corporate formalities of the DGCL could lead to (1) imprecision concerning what action has been ratified and whether (when no single controlling stockholder exists) the requisite level of approval has been obtained, and (2) a lack of transparency to non-assenting stockholders. The importance of these factors in the corporate context is discussed further below, in Section II.B.3.

Focusing on ratification in the corporate context, defendants acknowledge that "ratification is commonly achieved through a formal stockholder vote" but argue that "no formal vote is required," citing this Court's decision in the *Mother African Union* case.[60] That decision is of no help to defendants.

In *Mother African Union*, which involved a nonstock corporation, the Court determined that a church had validly disaffiliated from its conference because "the

---

[59] *Id.*

[60] Defs.' Op. Br. 25 (citing *Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *3 (Del. Ch. Apr. 22, 1992), *aff'd*, 633 A.2d 369 (Del. 1993)).

20

plaintiffs [had] established that the membership vote . . . met the requirements of [8 *Del. C.*] § 215(c) and therefore was valid."[61]  The Court went on to note that, "[i]n addition, a majority of the [church's] total membership later ratified the membership vote to disaffiliate (although it is not clear whether that was accomplished at a formal meeting called for that purpose)."[62]  Because the original vote of the nonstock corporation's members was statutorily valid, ratification was unnecessary and the Court's comment on that subject was dictum.  If anything, the Court's parenthetical pause to question whether an act of ratification had taken place at a *formal meeting* suggests that the Court, having found the vote valid on independent grounds, was uncertain whether the ratification would have been effective had it hypothetically been necessary, since the Court did not know whether it had occurred in a *formal* context.  *Mother African Union* thus seems to undermine defendants' position more than it helps it.

Next, defendants point to the Delaware Supreme Court's 1943 decision in *Frank v. Wilson & Co.*[63] for the proposition that a stockholder's conduct, including even inaction, may constitute a valid form of stockholder ratification.  The form of "ratification" at issue in *Frank*, however, bears no resemblance to the form of ratification at issue here, where the action of one stockholder (Zuckerberg) is being asserted to impact the rights of other stockholders.

---

[61] *Mother African Union*, 1992 WL 83518, at *3.

[62] *Id.*

[63] 32 A.2d 277 (Del. 1943).

In *Frank*, a Class A stockholder (Frank) challenged a recapitalization plan that converted his Class A stock into common stock. The recapitalization plan had been specifically approved at a meeting of stockholders, but Frank did not consent to the plan.[64] In a previous decision, the Supreme Court found the recapitalization plan to be void insofar as it forced the elimination of accrued past dividends for non-consenting stockholders,[65] thus permitting such stockholders (like Frank) to challenge it on that basis.[66] When Frank sued, however, the Supreme Court, affirming an opinion of the Court of Chancery, held that by virtue of Frank's conduct—his acceptance of common stock dividends "for upwards of two years" as though his Class A stock had been converted—he "must be held to have ratified the conversion of his Class A shares into common shares pursuant to the plan of recapitalization by his voluntary and decisive acts with full knowledge of the facts."[67] Thus, the issue before the Court was whether Frank's conduct precluded him as an equitable matter from being able to assert a claim for relief.

---

[64] *Id.* at 278-79.

[65] *Keller v. Wilson & Co.*, 190 A. 115, 126 (Del. 1936).

[66] Indeed, in a separate suit, the Court of Chancery refused to dismiss the complaint of another dissenting stockholder that had more clearly expressed its intent to challenge the same recapitalization plan and that did not receive common stock dividends. *Bay Newfoundland Co. v. Wilson & Co.*, 4 A.2d 668, 670, 673 (Del. Ch. 1939).

[67] *Frank*, 32 A.2d at 281, 283.

Critically, unlike here, the "ratification" found in *Frank* had no impact on the rights of any other stockholder.[68]

Turning to a case involving a limited liability company, defendants cite the Superior Court's decision in *Chantz Enterprises, LLC v. JHL Brighton Design/Decor Center, LLC* for the proposition that ratification may be carried out through affidavits.[69] In *Chantz*, a member of a defunct LLC had attempted to reinstate the LLC's charter and restore it to good standing.[70] Plaintiffs contested the member's ability to do so unilaterally, without the support of the LLC's other members. The Superior Court found that affidavits submitted by other members "prove[d] that [the member] did not unilaterally restore the company to good standing absent his co-members' agreement, and to the extent that it could be argued otherwise, 75% of the membership have now ratified

---

[68] The Supreme Court in *Frank* noted that the Court of Chancery's decision seemed to be "founded on the doctrine of acquiescence." 32 A.2d at 281. It further recognized that "[a]cquiescence and ratification are closely related," but appears to have chosen to apply the term "ratification" to address Frank's conduct based on the fact that "[a]cquiesence properly speaks of assent by words or conduct during the progress of a transaction, while ratification suggests an assent after the fact." *Id.* at 283. The doctrine of acquiescence recently was defined as a defense that applies when a claimant "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (holding that former CEO had acquiesced to his removal by his recognition of the removal and his subsequent conduct). Applying the standard articulated in *Klaassen*, the conduct referred to in *Frank* as ratification would appear to be more accurately described today as evidence of acquiescence.

[69] 2010 WL 2642885 (Del. Super. June 30, 2010).

[70] *Id.* at *3.

that action."[71] Thus, the Court's primary finding, based on the affidavits submitted, was that a sufficient number of members had formally agreed to reinstate the charter in the first place. The putative act of "ratification" appears to have been at most a secondary consideration stated in dictum.

The Superior Court's reference to ratification has little bearing on this case for two additional reasons. *Chantz* involved the ratification of one LLC member's allegedly unauthorized actions by the other members—in other words, all principals, no agents. It did not involve the situation presently before the Court, where a principal (Zuckerberg as a stockholder) seeks to ratify the actions of the corporation's agents (Facebook's directors). The case is also inapplicable because LLCs have a greater degree of flexibility in privately ordering their affairs than do corporations governed by the DGCL. For instance, by default, LLC members may vote by written or electronic consents without the formalities of DGCL Section 228,[72] and "an LLC's members have wide latitude to craft the members' rights and obligations."[73] As the Supreme Court recently noted, these are stark differences from corporate law that may result in different legal outcomes.[74]

---

[71] *Id.* at *4.

[72] 6 *Del. C.* § 18-302(d).

[73] *Paul v. Del. Coastal Anesthesia, LLC*, 2012 WL 1934469, at *2 (Del. Ch. May 29, 2012).

[74] *See Corwin v. KKR Fin. Holdings LLC*, – A.3d –, 2015 WL 5772262, at *1 n.3 (Del. Oct. 2, 2015) (noting that "in cases involving [alternative] entities, distinctive arguments

Finally, defendants suggest that stockholder acts such as tendering shares serve as an example of less formal ratification.[75] This suggestion is unpersuasive, because expressing approval of the sale of a company by tendering shares is not analogous to stockholder ratification. "Approving" a two-step transaction by tendering a sufficient number of shares in a tender offer is a functional requirement for completing such a transaction. Directors cannot tender stockholders' shares for them, so stockholders are not ratifying the transaction, but effectuating it in the first instance. A stockholder who chooses to sell her shares via a tender offer, moreover, may do so with minimal involvement from directors, due to "the lack of any explicit role in the General Corporation Law for a target board of directors responding to a tender offer."[76] Thus tendering shares bears no meaningful resemblance to a post hoc ratification of directors' actions.

For the reasons explained above, defendants' authorities are inapposite and do not persuade me that it would be sensible to deviate from the formal mechanisms available in the DGCL for expressing stockholder approval when seeking to ratify an action taken by a corporation's directors.

---

often arise due to the greater contractual flexibility given to those entities under our statutory law").

[75] *In re Orchid Cellmark Inc. S'holder Litig.*, 2011 WL 1938253, at \*13 (Del. Ch. May 12, 2011); *Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280, 294 (Del. Ch. 1998) ("[T]he BRC stockholders are being asked to decide to approve the sale of their corporation as a part of their decision whether or not to tender shares in the first-step tender offer.").

[76] *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 407 (Del. Ch. 2010).

### 3. Existing Authority and the Policies Underlying the Stockholder Approval Provisions of the DGCL Suggest that Formalities Must Be Followed to Effectuate Ratification in the Corporate Context

Defendants observe that there "is no case or statute that requires a stockholder vote or written consent for ratification purposes if the approval of a stockholder majority can be expressed another way."[77] Although no case has been identified that explicitly precludes (or permits) the use of informal means to ratify an act in a case like this, it is notable that many Delaware courts that have used stockholder ratification to apply the business judgment rule or to cure unauthorized conduct, have done so when the act of ratification occurred at a formal meeting of stockholders.[78] More importantly, references

---

[77] Defs.' Reply Br. 7.

[78] *See, e.g.*, *Michelson v. Duncan*, 407 A.2d 211, 219 (Del. 1979) (addressing stock option grant that was ratified by stockholders at annual meeting) ("It is the law of Delaware, and general corporate law, that a validly accomplished shareholder ratification relates back to cure otherwise unauthorized acts of officers and directors."); *Sample v. Morgan*, 914 A.2d at 656, 663-64 (rejecting ratification defense for compensation plan ratified by a stockholder vote at annual stockholder meeting, due to allegedly overbroad plan parameters and disclosure failures) ("When uncoerced, fully informed, and disinterested stockholders approve a specific corporate action, the doctrine of ratification, in most situations, precludes claims for breach of fiduciary duty attacking that action."); *Lewis v. Vogelstein*, 699 A.2d at 336 (reviewing compensation plan that was ratified by stockholders at annual meeting) ("In all events, informed, uncoerced, disinterested shareholder ratification of a transaction in which corporate directors have a material conflict of interest has the effect of protecting the transaction from judicial review except on the basis of waste."); *In re Wheelabrator Techs., Inc. S'holders Litig.*, 663 A.2d 1194, 1198, 1203 (Del. Ch. 1995) (addressing approval of merger at special stockholders meeting) ("Approval by fully informed, disinterested shareholders pursuant to § 144(a)(2) invokes the business judgment rule . . . .") (internal quotation marks omitted); *Lewis v. Hat Corp. of Am.*, 150 A.2d 750, 753 (Del. Ch. 1959) (addressing ratification by vote at a special meeting of stockholders) ("It is clearly established in Delaware that stockholder ratification of corporate action which is not per se void renders such action immune from minority stockholder attack . . . ."); *Gerlach v. Gillam*, 139 A.2d 591, 593 (Del. Ch. 1958) (also addressing ratification by vote at a special meeting of stockholders)

26

in existing case law to ratification in the context of a stockholder "vote," as well as policy considerations underlying the provisions of the DGCL for taking stockholder action, support the conclusion that adherence to formalities should be required in this context.

One foundational case is *Gantler v. Stephens.*[79] As the Supreme Court recently noted, *Gantler* is "a narrow decision focused on defining a specific legal term, 'ratification.'"[80] In *Gantler*, the Supreme Court held that the scope of "the shareholder ratification doctrine must be limited . . . to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval in order to become legally effective."[81] In my view, *Gantler*'s use of the phrase "fully informed shareholder ***vote***" in defining the concept of ratification was deliberate and was not intended to mean something less formal than an actual stockholder vote (or an action by written consent in lieu thereof).[82]

---

("[W]here a majority of fully informed stockholders ratify action of even interested directors, an attack on the ratified transaction normally must fail.").

[79] *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009).

[80] *Corwin v. KKR*, 2015 WL 5772262, at *5.

[81] *Gantler*, 965 A.2d at 713.

[82] *Cf.* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443, 1445 (2014) (discussing *Gantler* and noting that a stockholder or other second decision maker can "ratify the original decision by agreeing *formally* with the first decision maker") (emphasis added). Notably, Justice Jacobs, who wrote the opinion in *Gantler*, was the same jurist who as a Vice Chancellor decided the *Mother African Union* case, which, as discussed above, implied the need for a "formal meeting" to effectuate a ratification.

Recently, in *Corwin v. KKR*, which confirmed that stockholder approval from a statutorily required vote can be used to invoke the business judgment rule the same way an approval from a voluntary vote can, the Supreme Court again used specific voting language to explain the doctrine of ratification in the corporate context.[83] Specifically, the Supreme Court stated that "the doctrine applies only to fully informed, uncoerced stockholder votes," thereby implicitly excluding less formal methods of stockholder approval.[84]

Another example is 8 *Del. C.* § 144(a)(2), which prevents the voiding of a director's interested transaction if the "transaction is specifically approved in good faith by vote of the stockholders."[85] In describing that process, this Court stated in *Wheelabrator* that "*[a]pproval* by fully informed, disinterested shareholders pursuant to § 144(a)(2) invokes the business judgment rule and limits judicial review to issues of gift

---

[83] *Corwin v. KKR*, 2015 WL 5772262, at *6.

[84] *See id.*

[85] The *Fletcher Cyclopedia of the Law of Corporations* similarly states that, as a matter of general corporate law doctrine, ratification takes place at a stockholder meeting. *See* 3 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 982, at 626-27 (perm. ed., rev. vol. 2010) ("The [interested] transaction may be ratified by a majority of the shareholders at a meeting of the shareholders, or by all the shareholders independent of any meeting, and a contract made by the directors of a corporation, which was either authorized or subsequently ratified by a majority vote of the shareholders in a meeting regularly assembled, is not affected by the fact that one or more of the directors had an interest in such contract other than as shareholders in the corporation."); *id.* § 979, at 618-20 ("The parties asserting the defense of shareholder ratification have the burden of proving the *vote* was an informed one and that there was full disclosure.") (emphasis added).

or waste with the burden of proof upon the party attacking the transaction."[86]  Although the statutory language plainly refers to the need for a "vote of the stockholders," *Wheelabrator* simply uses the word *approval* to indicate this formal requirement, suggesting again that Delaware courts naturally assume that stockholder approval requires adherence to formalities.[87]

Precedent also suggests that compliance with statutory formalities is necessary even for an individual controlling stockholder.  In *Ravenswood Investment Co., L.P. v. Winmill & Co., Inc.*, for example, this Court scrutinized the written consent of an individual controlling stockholder (who held *all* of the voting power in the company) to approve a stock plan that would have been invalid without stockholder approval.[88]  A holder of non-voting stock sought to invalidate the written consent for failing to comply with Section 228 because the consent was only dated with a single pre-printed "as of" date, suggesting a date of effectiveness, rather than with an individual signature date for the controlling stockholder.[89]  Although the Court ultimately upheld the consent because

---

[86] *In re Wheelabrator*, 663 A.2d at 1203 (emphasis added) (internal quotation marks omitted).

[87] In the analogous context of Section 144(a)(1), which allows for approval of interested transactions by fully informed, disinterested directors, this Court has suggested that such approval must occur at a formal meeting of directors.  *See Lewis v. Fuqua*, 502 A.2d 962, 970 (Del. Ch. 1985) (noting party's concession that 8 *Del. C.* § 144 did not apply because "the approval did not take place at a formal Board meeting or necessarily after full disclosure of all material facts").

[88] 2013 WL 6228805, at *1 (Del. Ch. Nov. 27, 2013).

[89] *Id.*

one reading of it suggested compliance with the technical requirements of Section 228, the Court's close scrutiny demonstrates that compliance with formalities was imperative even when there was no question concerning the wishes of the sole voting stockholder.[90]

In my opinion, the policies underlying the DGCL provisions governing the taking of stockholder action further support the conclusion that stockholders—including controlling stockholders like Zuckerberg—must observe statutory formalities when seeking to ratify director action. Doing so will avoid ambiguity and misinterpretation by ensuring that actions taken by stockholders are defined with precision and—where a single controlling stockholder is not present—that the requisite level of approval was obtained, and will promote transparency for the benefit of all stockholders. As the Delaware Supreme Court recently stated, "[c]ertainty and efficiency are critical values when determining how stockholder voting rights have been exercised."[91]

Defendants contend that formal processes such as a stockholder vote or a written consent can be convenient methods of ratification for groups of stockholders, who may suffer from collective action difficulties, but that they are not necessary for a controlling stockholder whose will can be clearly expressed without formalities. They argue that permitting many sorts of acts to constitute ratification poses no problem of imprecision, because "[b]y virtue of his voting control, Mr. Zuckerberg can be the singular voice of

---

[90] *See id.* at *2.

[91] *Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 377, 395 (Del. 2010) (dispute over election of directors).

30

Facebook's stockholders . . . ."[92]  I disagree.  Although an affidavit is a relatively formal expression, once the statutory framework is removed, the possibilities for ambiguity in expressing approval are seemingly limitless—if affidavits are sufficient, what about meeting minutes, press releases, conversations with directors, or even "Liking" a Facebook post of a proposed corporate action?[93]  Such an approach would require directors, stockholders, and courts to engage in the inefficient exercise of divining the intentions of a controlling stockholder, and would cut away at the certainty and precision that make the formalities of stockholder meetings or statutorily compliant written consents beneficial.

Zuckerberg's deposition testimony illustrates the problem.  Discussing Facebook's board of directors, Zuckerberg testified that "[t]hese are the people who I want . . . and who I think will serve the company best, and I think that the compensation plan that we have is doing its job of attracting and retaining them over the long term."[94]  It is far from clear that Zuckerberg intended that statement to be a definitive ratification of a specific corporate act.  The year of the compensation in question is not mentioned, and Zuckerberg provides no language indicating final approval of a past compensation act.  Yet the defendants assert that Zuckerberg's deposition testimony constitutes an

---

[92] Defs.' Reply Br. 8.

[93] *See Definition of Facebook "Like" Button*, WhatIs.com Glossary, http://whatis.techtarget.com/definition/Facebook-Like-button (last visited Oct. 27, 2015).

[94] Defs.' Reply Br. 9-10 (quoting Zuckerberg Dep. 63:7-11).

independent act of ratification.[95] After a controlling stockholder is no longer affiliated with the corporation, moreover, the problems of ambiguity and the potential for misinterpretation are compounded because the source of the ratifying act may no longer be available to explain what precisely was intended.

Failing to adhere to corporate formalities to effect stockholder ratification also impinges on the rights of minority stockholders. In traditional agency relationships, a single principal's ratification of an agent's conduct comes at a cost to that principal only. But in the corporate context, the ratification decisions of a controlling stockholder affect the minority stockholders. Although minority stockholders have no power to alter a controlling stockholder's binding decisions absent a fiduciary breach, they are entitled to the benefits of the formalities imposed by the DGCL, including prompt notification under Section 228(e).[96] This requirement promotes transparency and enables minority stockholders to stay abreast of corporate decision-making and maintain the accountability of boards of directors and controlling stockholders. In this vein, this Court has commented that the written consent procedure keeps minority stockholders' voting rights

---

[95] Defs.' Reply Br. 9 (referring to both Zuckerberg's deposition statement and his affidavit as specific approvals); *id.* at 4 (noting that defendants "rely exclusively" upon Zuckerberg's deposition and affidavit to establish ratification). Zuckerberg's affidavit, which states that he "approve[s] of all 2013 equity awards to Facebook's Non-Executive Directors," does not suffer from such problems of ambiguity, although "approving of" an action is less definitive than simply "approving" it. *See* Zuckerberg Aff. ¶ 10.

[96] 8 *Del. C.* § 228(e) ("Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders or members who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting . . . .").

intact, even if those rights are rendered moot when a majority stockholder executes a decision.[97]

It is therefore of no moment that Zuckerberg undisputedly controls Facebook. Although he can outvote all other stockholders and thus has the power to effect any stockholder action he chooses, he still must adhere to corporate formalities (and his fiduciary obligations) when doing so, because his rights as a stockholder are no greater than the rights of any other stockholder—he simply holds more voting power. Consequently, just as a majority *group* of stockholders must follow the requirements of Section 228 in fairness to the minority stockholders, a single holder of a majority of voting power must do so as well.

Defendants offer no policy rationale to explain why a controlling stockholder need not adhere to the rules of stockholder meetings or Section 228 for ratification specifically, as opposed to corporate action generally. They do not explain whether ratification should require less formality than other stockholder actions, and if it should, why. In my view, since ratification can shield the transactions of interested directors and provide them authorization to take sweeping action, it is equally as powerful a tool as any other direct stockholder action. If Zuckerberg does not need to provide written consents to ratify the 2013 Compensation, why require written consents for any other action he takes? Such a

---

[97] *Matulich v. Aegis Commc'ns Grp., Inc.*, 2007 WL 1662667, at *6 (Del. Ch. May 31, 2007), *aff'd*, 942 A.2d 596 (Del. 2008) ("The purpose of written consent is not to invalidate the voting rights of minority shareholders, but rather to spare a corporation the expense of otherwise unnecessary corporate formalities. A shareholder's entitlement to vote does not disappear when a majority shareholder exercises a right to written consent. What disappears is the need for the corporation to deal administratively with that vote.").

regime would essentially negate most requirements under Delaware law to notify stockholders of meaningful events.

Balanced against the informational costs of a less formal system of stockholder approval are the financial costs of formalities. Defendants argue that Facebook chose to avoid "the added expense of a stockholder vote or action by written consent" since it was not obliged to follow those legal requirements when securing Zuckerberg's ratification.[98] But Section 228 already serves as a convenient method of avoiding the expense of a stockholder vote. Although its requirements are strictly construed, they are not numerous or burdensome. Indeed, the burden and expense of this litigation undoubtedly dwarf the burden of Zuckerberg signing an appropriate form of consent in this case. In any event, regardless of whether Section 228 may be more or less costly than informal alternatives in a particular situation, Zuckerberg may not opt out of the procedures by which stockholders may take corporate action in favor of a less formal method of his choosing.

\* \* \* \* \*

For the reasons stated above, I hold that stockholder ratification of an interested transaction, so as to shift the standard of review from entire fairness to the business judgment presumption, cannot be achieved without complying with the statutory formalities in the DGCL for taking stockholder action. Consequently, neither Zuckerberg's affidavit nor his deposition testimony ratified the Facebook board's decision to approve the 2013 Compensation, which decision remains subject to entire

---

[98] Defs.' Reply Br. 9 n.8.

34

fairness review because a majority of the board was personally interested in that transaction.

The entire fairness standard of review requires defendants to establish that the "transaction was the product of both fair dealing and fair price."[99] Because defendants relied solely on a ratification defense, they did not attempt to produce evidence of entire fairness sufficient to show an entitlement to judgment as a matter of law, nor have they demonstrated that there is no genuine issue of material fact as to the entire fairness of the 2013 Compensation. I therefore deny their motion for summary judgment as to Count I.

## C.     Count III:  Unjust Enrichment

Plaintiff asserts in Count III that defendants were unjustly enriched by the 2013 Compensation, which they received as a result of the alleged breaches of their fiduciary duties. Defendants move for summary judgment on this count as well.

A claim for unjust enrichment requires "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[100] In arguing for summary judgment, defendants rely entirely on the principle that, if plaintiff's claim for breach of fiduciary duty fails, his claim for unjust enrichment on the basis of such breach must fail as well.[101] The corollary to that argument plays out here. If defendants' sole

---

[99] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[100] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[101] Defs.' Op. Br. at 33-34; Defs.' Reply Br. at 14.

basis for summary judgment on a duplicative unjust enrichment claim is the failure of the underlying claim for breach of fiduciary duty, then the survival of the fiduciary duty claim logically allows the claim for unjust enrichment to survive as well.[102]  For this reason, I deny defendants' motion for summary judgment as to the unjust enrichment claim.

### D.    Count II:  Waste of Corporate Assets

Plaintiff asserts in Count II that the 2013 Compensation constituted a waste of corporate assets.[103]  Defendants counter that the extreme test for waste is not satisfied here.[104]  I agree with defendants.

"[W]aste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."[105]  Thus, to state a claim for waste, "a plaintiff must allege particularized facts that lead to a reasonable inference that the director defendants authorized an exchange that is so one sided that no business person of ordinary, sound

---

[102] The survival of one claim resulting in the survival of a duplicative claim often occurs at the motion to dismiss stage.  *See, e.g.*, *Calma*, 114 A.3d at 592 (Del. Ch. 2015) (concluding that because fiduciary duty claim survived motion to dismiss, duplicative unjust enrichment claim could also survive); *McPadden v. Sidhu*, 964 A.2d 1262, 1276-77 (Del. Ch. 2008) (declining to dismiss a duplicative unjust enrichment claim despite the fact that, if plaintiff later prevailed on both claims, he would then "have to elect his remedies").  Defendants have moved for summary judgment on the claim for unjust enrichment rather than to dismiss it.  Nonetheless, I apply the same rationale here.

[103] Compl. ¶¶ 30-33.

[104] Defs.' Op. Br. 34-36.

[105] *Lewis v. Vogelstein*, 699 A.2d at 336.

judgment could conclude that the corporation has received adequate consideration."[106] The test for waste is extreme and rarely satisfied.[107]  Consequently, even if a plaintiff successfully raises questions concerning the fairness of director compensation, he does not necessarily succeed in pleading "the rare type of facts from which it is reasonably conceivable" that the compensation awards constituted corporate waste.[108]

In support of the waste claim, plaintiff argues that the average compensation for Facebook's non-employee directors is 43% higher than the average compensation for directors in a specified peer group of companies, despite Facebook's lower-than-average net income and revenue, and stock price movement that plaintiff views as insufficient to justify the compensation awarded.[109]  Such allegations are essentially complaints that some portion of defendants' 2013 Compensation was above and beyond what they deserved for their performance.  As such, the allegations fall far short of demonstrating that such compensation constitutes a gift or gratuity for which the corporation received no consideration.[110]  Under this Court's precedents, allegations that compensation is

---

[106] *Seinfeld v. Slager*, 2012 WL 2501105, at *3 (quoting *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 136 (Del. Ch. 2009)) (internal quotation marks omitted).

[107] *Cambridge Ret. Sys.*, 2014 WL 2930869, at *9.

[108] *Calma*, 114 A.3d at 591.

[109] Compl.  ¶¶ 2, 17, 18.

[110] *Lewis v. Vogelstein*, 699 A.2d at 335-36.

"excessive or even lavish, as pleaded here, are insufficient as a matter of law to meet the standard required for a claim of waste."[111]

Plaintiff wisely refrains from alleging that the all-star cast on Facebook's board is so lacking in talent or exerts so little effort that Facebook receives nothing in return for compensating its members. Without any such allegations, which presumably could not be made in good faith, the claim that Facebook paid its directors more than it should have relative to an alleged peer group of companies fails to state a legally cognizable claim for waste of corporate assets.

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment as to Counts I (breach of fiduciary duty) and III (unjust enrichment) is denied, and defendants' motion to dismiss Count II (waste of corporate assets) is granted.

**IT IS SO ORDERED**.

---

[111] *See In re 3COM Corp. S'holders Litig.*, 1999 WL 1009210, at *5 (Del. Ch. Oct. 25, 1999).