IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

PALISADES GROWTH CAPITAL II, L.P., )
 )
 Plaintiff, )
 )
 v. ) C.A. No. 2019-0931-JRS
 )
ALEX BÄCKER and RICARDO BÄCKER, )
 )
 Defendants, )
 )
 and )
 )
QLESS, INC., a Delaware corporation, )
 )
 Nominal Defendant. )

 MEMORANDUM OPINION

 Date Submitted: March 12, 2020
 Date Decided: March 26, 2020

Bradley R. Aronstam, Esquire, Roger S. Stronach, Esquire and Holly E. Newell,
Esquire of Ross Aronstam & Moritz LLP, Wilmington, Delaware; Michael C.
Hefter, Esquire of Hogan Lovells US LLP, New York, New York; and Jon M.
Talotta, Esquire, Samuel W. Yergin, Esquire and Thomas B. Hunt, Esquire of Hogan
Lovells US LLP, Tysons, Virginia, Attorneys for Plaintiff Palisades Growth
Capital II, L.P.

Thomas A. Uebler, Esquire, Joseph L. Christensen, Esquire and Hayley M. Lenahan,
Esquire of McCollom D’Emilio Smith Uebler LLP, Wilmington, Delaware,
Attorneys for Defendants Alex Bäcker and Ricardo Bäcker.

Catherine A. Gaul, Esquire, Marie M. Degnan, Esquire, Randall J. Teti, Esquire and
Michael D. Walker, Esquire of Ashby & Geddes, Wilmington, Delaware, Attorneys
for Nominal Defendant QLess, Inc.

SLIGHTS, Vice Chancellor
 Defendant, Alex Bäcker (“Bäcker”), is a co-founder of QLess, Inc. (“QLess”

or the “Company”). He was also the Company’s CEO until QLess’s Board of

Directors (the “Board”) removed him from that position in June 2019. Bäcker

appeared to accept his termination and cooperated with the Board as it searched for

his replacement. While questions remained about what Bäcker’s continuing role at

QLess would be, the Company’s investors believed Bäcker had accepted he would

no longer lead QLess as CEO.

 Like many early stage companies, QLess’s governance documents apportion

control between the Company’s founder and its investors. Specifically, under

QLess’s certificate of incorporation (the “Charter”), Bäcker, as the majority owner

of the Company’s common stock, has the right to appoint two directors to QLess’s

Board. Plaintiff, Palisades Growth Capital II, L.P. (“Palisades”), as the majority

owner of the Series A Preferred Stock, has the right to appoint one director to the

Board. And non-party, Altos Hybrid 2 L.P., (“Altos”), as majority owner of the

Company’s Series A-1 Preferred Stock, has the right to appoint one director to the

Board. Bäcker and the investors made further provisions for appointing directors to

the Board in a voting agreement (the “Voting Agreement”), whereby the parties

agreed to appoint one jointly designated independent director and, if Bäcker were

terminated as CEO, to create a new CEO director seat to be filled with Bäcker’s

replacement.

 1
 At the time Bäcker was terminated as CEO, all five board seats were filled.

Bäcker served as one common director; his father, Defendant, Ricardo Bäcker

(“Ricardo”),1 served as the second common director; non-party, Jeff Anderson

(“Anderson”), served as Palisades’s designee; non-party, Hodong Nam (“Nam”),

served as Altos’s designee; and non-party, Ivan Markman (“Markman”), served as

the independent director.

 Non-party, Kevin Grauman (“Grauman”), was hired as CEO in September

2019, with Bäcker’s apparent blessing. Under the Voting Agreement, with Bäcker

now terminated as CEO, Grauman was to fill the newly-created CEO Board seat.

 Nam resigned his position on the Board shortly after Grauman was hired.

After some dithering, Nam agreed that non-party, Paul D’Addario (“D’Addario”),

a partner at Palisades, should replace him as Altos’s designated director. While the

Series A-1 holders have an exclusive right under the Charter to appoint a director,

QLess’s outside counsel advised Altos that a Board vote would be required to

confirm D’Addario’s appointment. With this advice in mind, the Board arranged

for a telephone meeting to occur on November 15, 2019, in order formally to appoint

D’Addario and Grauman to the Board, and to attend to other QLess business.

1
 I refer to Ricardo Bäcker by his first name to avoid confusion, without intending
familiarity or disrespect.

 2
 Markman unexpectedly resigned his independent director seat on

November 14. Believing that he held a 2-1 Board majority, Bäcker seized the

moment by scheming with Ricardo (and counsel) to take control of the Company in

advance of the November 15 meeting. With plan (and corresponding Board

resolutions) in hand, Bäcker announced at the outset of the meeting that he held a 2-

1 Board majority and then demanded that Grauman and D’Addario disconnect from

the call (i.e., leave the Board meeting) since they were not members of the Board.

Grauman left the meeting but D’Addario refused to disconnect. With Ricardo’s

support, Bäcker then fired Grauman as CEO, appointed himself to replace Grauman

as CEO and fill the CEO director seat, appointed himself as CFO, ratified a new

employment agreement for himself, appointed non-party, Patricio Cuestra

(“Cuestra”), to fill Bäcker’s now vacant common director seat and amended the

Company’s Bylaws to provide for a quorum of three when (or if) the Board were to

be comprised of six members. This concerted action was undertaken over

Anderson’s dissenting vote and D’Addario’s heated objection.

 According to Defendants, at the conclusion of the November 15 meeting, the

Board was comprised of Ricardo and Cuestra as common directors, Bäcker as CEO

director, and Anderson as the Series A Director. By Defendants’ lights, the Series

A-1 and independent director seats were, and remain, vacant.

 3
 Palisades filed its Complaint on November 20, 2019, in which it seeks an

order under 8 Del. C. § 225 declaring that D’Addario was validly appointed to the

Board before the November 15 meeting, rendering any action taken at that meeting

a nullity. The Complaint also alleges a breach of the Voting Agreement for failure

to confirm Grauman to the CEO director seat. In the alternative to its statutory and

contractual arguments, Plaintiff urges this Court to exercise its equitable powers to

invalidate the actions taken at the contested meeting.

 In this post-trial Memorandum Opinion, after careful consideration of the

evidence, I find that D’Addario was never validly appointed to the Board. And,

while Bäcker and Ricardo were not forthcoming with Palisades and Altos in advance

of the November 15 meeting, they did not take any affirmative action to prevent

Altos from exercising its rights with respect to the Series A-1 Board vacancy.

As there was no deceptive action relating to the appointment of the Series A-1

director in advance of the November 15 meeting, equity cannot be invoked to turn

back the clock and appoint D’Addario to the Board prior to that meeting.

 Additionally, it is not at all clear that Bäcker breached the Voting Agreement

by refusing to recognize Grauman as a duly appointed member of the Board. While

the evidence clearly demonstrates that the parties to the Voting Agreement intended

that Grauman would take the newly created CEO Board seat in advance of the

 4
November 15 meeting, the specific means by which that Board vacancy was to be

filled are not at all clear in either the Bylaws or the Voting Agreement itself.

 The inquiry regarding the propriety of the Bäckers’ conduct in advance of,

and at, the November 15 meeting does not end with an assessment of their

compliance with the operative QLess governance documents. The Bäckers were

fiduciaries and must conduct themselves accordingly. While they took no steps to

interfere with Altos’s right to elect its Board designee, they did affirmatively deceive

the other QLess directors into attending the November 15 meeting on the belief that

the Bäckers would honor the Voting Agreement by appointing Grauman to the

vacant CEO director seat. As Grauman should have been appointed to the Board as

of, or at, the November 15 meeting, the actions taken at that meeting lacked approval

by a majority of the Board and are, therefore, voided, regardless of whether vel non

Bäcker breached the Voting Agreement.

 I. BACKGROUND

 I have drawn the facts from the parties’ pretrial stipulation and the evidence

admitted at trial.2 The trial record consists of eight lodged depositions, 495 joint

trial exhibits and the arguments of counsel presented at a trial on a paper record on

2
 I cite to the trial arguments of counsel as “Tr.__”, the Joint Pre-Trial Stipulation and Order
as “PTO ¶ __”, the joint trial exhibits as “JX__” and Depositions as “Name Dep. __.”

 5
January 7, 2020. The following facts were proven by a preponderance of the

competent evidence.3

 A. The Parties and Relevant Non-Parties

 Plaintiff, Palisades, is a private equity firm that first invested in QLess in

August 2017.4 Per the Charter, Palisades controls the Series A Director seat through

its ownership of the majority of the Company’s Series A preferred stock.5

 Defendant, Alex Bäcker, co-founded QLess in 2009 and served as the

Company’s CEO until June 7, 2019.6 Bäcker owns the majority of the Company’s

common stock.7 As majority common stockholder, he controls the two common

director seats of the Board.8

3
 Elements of Plaintiff’s claims appear to rest on a prayer for specific performance of the
Voting Agreement. While I ultimately do not grant that relief, I did consider the evidence
during deliberations with the burden of proof applicable to a decree of specific performance
in mind. See Pipkin v. Johnston, 1977 WL 9570, at * (Del. Ch. Apr. 15, 1977) (“It is well
established that specific performance will not be decreed unless the evidence and terms of
the contract to be enforced are established by that high degree of proof which has been
variously characterized as ‘clear,’ ‘clear and convincing,’ ‘clear and satisfactory’ or other
equivalent expressions.”) (citations omitted).
4
 PTO ¶ 4; JX 458 (Anderson Dep.) 14:25–15:4.
5
 PTO ¶ 4.
6
 JX 457 (Bäcker Dep.) 14:2–5; PTO ¶ 5.
7
 PTO ¶ 5.
8
 Id.

 6
 Defendant, Ricardo Bäcker, is Alex Bäcker’s father.9 He holds a small

amount of preferred stock in the Company and was elected as the second common

director by Alex Bäcker on March 31, 2019.10

 Nominal Defendant, QLess, is a privately held Delaware corporation

headquartered in Pasadena, California.11 QLess produces and licenses a virtual

queue management system that reduces the time retail customers have to wait in line

for service.12

 Non-party, Altos, is an investment firm that first invested in QLess in

November 2018.13 Per the Charter, Altos controls the Series A-1 Director seat

through its ownership of the majority of the Company’s Series A-1 preferred stock.14

9
 PTO ¶ 6.
10
 Id.
11
 PTO ¶ 3, JX 5 (“Charter”) at 1.
12
 PTO ¶ 14.
13
 PTO ¶ 7.
14
 Id.

 7
 Non-party, Grauman, was hired as QLess’s CEO in September 2019.15 His

purported firing at the November 15, 2019 Board meeting is at issue in this

litigation.16

 Non-party, Anderson, is a partner at Palisades. He was Palisades’s initial

designee to the Series A Director seat and still serves in that role.17

 Non-party, Nam, is a co-founder of Altos.18 He was Altos’s designee to the

QLess Board from when Altos first invested in QLess until his resignation on

September 30, 2019.19

 Non-party, D’Addario, is a Senior Managing Director of Palisades.20 He was

Nam’s choice to take Altos’s Series A-1 Director seat after Nam’s resignation.21

15
 PTO ¶ 8.
16
 Id.
17
 PTO ¶ 4: Anderson Dep. 16:12–18.
18
 JX 453 (“Nam Dep.”) 14:13–15:5.
19
 PTO ¶¶ 18, 26.
20
 PTO ¶ 9.
21
 PTO ¶ 28; JX 254 at 2–3.

 8
 Non-party, Markman, served as the independent director of QLess from

November 27, 2018 until his resignation on November 14, 2019.22 The parties agree

that the independent director seat remains vacant.

 B. Bäcker’s Termination as CEO

 In early 2019, only a few months after Altos invested in QLess, the

Company’s employees began to report to the Board that Bäcker’s leadership was

creating a toxic work environment.23 Senior executives told Anderson that Bäcker

was becoming “increasingly withdrawn and unhinged, either totally absent and

disconnected or hyper micromanaging and combative,” and the Board grew worried

that the Company was at risk of a mass employee exodus.24 Exasperating the

situation, Bäcker terminated the Company’s Vice President of Engineering in March

2019, a move that drew considerable ire from the QLess investors.25

 At this point, Anderson thought Bäcker should be relieved of his duties as

CEO, but Nam and Markman were more hesitant, expressing a preference that

Bäcker receive leadership coaching before the Board gave further thought to

22
 PTO ¶ 10.
23
 Anderson Dep. 159:15–160:6; JX 451 (“Markman Dep.”) 26:7–28:23; Nam Dep.
174:16–175:17.
24
 JX 45; Anderson Dep. 26:20–27:2.
25
 Nam Dep. 35:16–17; JX 21; Anderson Dep. 145:4–147:20.

 9
termination.26 The Board, sans Markman, met on March 28, 2019.27 At Nam’s

request, two outside consultants were invited to provide coaching (and counseling)

to Bäcker and the Board.28 The meeting was not productive and ended with a

majority of the Board concluding that Bäcker should be terminated as CEO.29 Nam

informed Bäcker soon after that the Board believed he should step down.30

 Three days later, Nam and Anderson called a special meeting of the Board to

discuss Bäcker’s status with the Company.31 Unwilling to resign, Bäcker took action

to secure his role as CEO. He fired QLess’s President and Corporate Secretary and

replaced Michael Bell, Bäcker’s initial designee as common director who now

supported Bäcker’s termination, with Ricardo.32 While there was some dispute

among the Board members as to the legal validity of Bäcker’s replacement of Bell

with Ricardo, Nam, Anderson and Bell eventually acknowledged the change after

26
 Anderson Dep. 69:22–70:15; JX 21; Anderson Dep. 90:14–20.
27
 JX 24.
28
 Id. at 1–2.
29
 Id.; Nam Dep. 155:14–156:4.
30
 Nam Dep. at 259:14–260:1.
31
 JX 34 at 2–3.
32
 JX 58; Anderson Dep. 69:22–70:25; JX 81 at 2; JX 456 (“Ricardo Dep.”) 32:15–33:4.

 10
being advised by QLess’s outside general counsel, Scott Alderton (“Alderton”), that

the replacement was valid.33

 With Ricardo staunchly in Bäcker’s camp and Markman on the fence, firing

Bäcker no longer had majority Board support.34 In the following weeks, unrest at

QLess increased with a key employee resigning and members of the management

team detailing their objections to Bäcker’s leadership in a letter to the Board.35

In response, the Board voted to form a Special Committee, comprising Anderson,

Nam and Markman, to investigate the complaints lodged against Bäcker.36 The

Special Committee hired counsel who conducted a month and a half long

investigation.37

 On May 29, 2019, counsel sent its report of the investigation to the Special

Committee.38 The report substantiated many of the employee complaints about

Bäcker, including that staff reasonably believed he “retaliated” against employees,

“made demeaning comments or used demeaning language,” and “made comments

33
 See JX 37; JX 53; JX 42; JX 104.
34
 See JX 73.
35
 JX 119; JX 111.
36
 JX 129.
37
 JX 149.
38
 While QLess has asserted privilege over the full report, a summary of the report was
admitted into evidence without objection. See Tr. 13:9–20; JX 149.

 11
about (or to) women” that were offensive.39 In response, the Special Committee

recommended to the full Board that Bäcker be terminated.40 On June 8, the Board

met and voted to remove Bäcker as CEO.41

 C. The Events Leading to the November 15 Meeting

 After Bäcker’s termination, the Board conducted an extensive search for a

new CEO, eventually hiring Grauman on September 7, 2019.42 While Bäcker

supported Grauman’s appointment as CEO, their relationship soon became

“strained” as Grauman sensed that Bäcker was not comfortable relinquishing the

CEO role.43

 On September 30, 2019, Nam resigned as Series A-1 Director.44 Anderson

quickly reached out to Nam requesting that Altos designate a Palisades party to serve

as Series A-1 Director rather than leaving the seat vacant.45 After some

39
 Id.
40
 JX 166 at 11.
41
 Id. at 1. It is undisputed this event constituted a “Bäcker Termination Event” as defined
by the Voting Agreement. See JX 7 at § 1.1.
42
 JX 196.
43
 Id.; JX 454 (“Grauman Dep.”) 36:12–38:16.
44
 JX 212.
45
 JX 220.

 12
consideration of alternate arrangements, Nam agreed.46 Altos General Counsel, Rick

Arnold, sent an email to Alderton on October 28 requesting that Alderton “draft and

circulate the necessary stockholder consent to elect Paul D’Addario . . . to the QLess

Board as the Altos designee[.]47 The email continued, “[w]e would like to fill the

vacancy left by [Nam’s] resignation with [D’Addario] as soon as possible.”48

 Unfortunately, Company counsel misunderstood the mechanics of how a

Series A-1 Director vacancy is filled. Even though the Charter gives the Series A-1

preferred stockholders the exclusive right to elect a director by vote or written

consent, Alderton advised Nam and Anderson that a Board resolution presented at a

duly called Board meeting would be required to place D’Addario in Nam’s vacant

Series A-1 Board seat.49 Relying on this advice, Altos took no further action to elect

46
 JX 276. Defendants’ arguments that Nam did not have a firm intent to appoint
D’Addario to the Board border on frivolous. Although Nam did initially discuss other
options with Bäcker, he quickly settled on D’Addario as his choice. Id; JX 254, JX 292;
JX 293.
47
 JX 254 at 2.
48
 Id.
49
 Charter § 3.2; see JX 254 at 1 (“It is mechanics [Nam]. Your appointment is contractual,
in other words you have the contractual right to designate who the Series A-1 director will
be, but that person still needs to be either elected by the stockholders under Delaware law,
or in this case since it is filling a vacancy, appointed by the Board.”) (emphasis added).
There is no evidence that Bäcker had anything to do with the incorrect advice Alderton
gave to Altos. I say incorrect advice because, as discussed below, the Charter allows the
Series A-1 stockholders the exclusive right to elect their Board designee, and the Bylaws
expressly defer to the Charter with respect to filling Board vacancies. JX 8 (“Bylaws”) §
3.2.

 13
D’Addario, though Nam reiterated his desire that D’Addario be appointed to the

Board on numerous occasions.50

 On October 27, Bäcker requested that the Board convene for a meeting, and

the parties agreed to meet telephonically on November 15.51 As the parties were

scheduling this meeting, Anderson realized Grauman was not on the email thread

and inquired as to why he was not included.52 Bäcker responded, “Kevin [Grauman]

is on the thread, assuming [the Board] now includes him, which I requested it

does.”53 On November 11, per Bäcker’s request, Grauman circulated proposed

resolutions for the meeting.54 The resolutions included, among other items,

replacing Nam on the Board with D’Addario and confirming Grauman’s role as the

CEO director.55 Neither of the Bäckers objected to these agenda items.56

50
 JX 292; JX 293.
51
 JX 246.
52
 JX 224 at 1.
53
 Id. (emphasis added).
54
 JX 268; JX 289.
55
 JX 289 at 1–2; see JX 303.
56
 Bäcker did inform Alderton that there was an issue with an option grant to Ricardo in
the proposed resolutions and requested new resolutions correcting the error. See JX 290
at 1; JX 452 (“Alderton Dep.”) 110:24–112:18; JX 700.

 14
 On the morning of November 14, just one day before the meeting, Markman

unexpectedly resigned his position as independent director.57 Markman made this

decision after a phone call with Bäcker that led Markman to believe Bäcker would

try to reinstate himself as CEO.58 In explaining his resignation, Markman stated,

“I decided I just didn’t have time” for continuing as a Board member.59

 Believing that Markman’s resignation allowed him to make the case that he

enjoyed a 2-1 majority on the Board, Bäcker leapt into action in advance of the

November 15 meeting. After discussing the matter with his own counsel, Bäcker

circulated alternate proposed resolutions to Ricardo and Cuestra.60 This set of

proposed resolutions differed radically from the set Grauman had circulated a few

days earlier. Among other actions, the resolutions purported to: terminate

Grauman’s appointment as CEO; reappoint Bäcker as CEO and appoint him CFO;

appoint Bäcker to the CEO director Board seat; appoint Cuestra to Bäcker’s newly

vacant common director seat; ratify an employment agreement for Bäcker; and

amend the Bylaws to provide for a quorum of three members when the Board is six

57
 JX 425.
58
 Markman Dep. 68:12–69:6. His resignation notice did not include any reason as to why
he resigned. JX 425.
59
 Markman Dep. 70:14–19.
60
 JX 304; Tr. 124:5–13. Cuestra had been consulting for QLess for several months prior
to the November 15 meeting. Bäcker Dep. 267:8–20.

 15
members.61 These moves, in total, would essentially lock in Bäcker’s control of

QLess.

 Bäcker, with Ricardo’s support, executed his plan at the November 15

meeting. The meeting’s participants included Bäcker, Ricardo, Anderson,

D’Addario, Grauman and Alderton.62 After calling the meeting to order, Bäcker

demanded Grauman and D’Addario leave the call. Grauman agreed but D’Addario

refused.63 With Ricardo’s support, Bäcker proceeded to vote through each of his

proposed resolutions over the objections of Anderson and D’Addario.64

 D. Procedural History

 Palisades filed its Verified Complaint on November 20, 2019. The Complaint

asserts four counts: Count I seeks a declaratory judgment pursuant to 8 Del. C. § 225

that the QLess Board comprises Anderson, D’Addario, Bäcker and Ricardo;

Count II seeks a declaratory judgment pursuant to 8 Del. C. § 225 that Grauman is

the QLess CEO; Count III seeks specific performance of the Voting Agreement,

which would require the parties to elect Grauman to the CEO director seat; and

Count IV alleges direct and derivative breach of fiduciary duty claims against Alex

61
 JX 304.
62
 JX 402 at 4.
63
 Id.
64
 Id.

 16
and Ricardo Bäcker.65 Given the expedited nature of Section 225 proceedings, the

parties agreed to bifurcate the fiduciary duty claims from the Section 225 Action.66

 II. ANALYSIS

 Our General Corporation Law vests power in the Court of Chancery to review

contested elections of officers and directors.67 A Section 225 proceeding is

“summary in character, and its scope is limited to determining those issues that

pertain to the validity of actions to elect or remove a director or officer.”68

 Palisades advances two arguments as to why D’Addario was validly elected

to the QLess Board in advance of the November 15 meeting such that all actions

taken at that meeting are void. First, it argues that an October 28 email from Altos’s

general counsel to QLess’s outside general counsel reflects a “vote” of the Series A-

1 Preferred Stockholders to place D’Addario on the Board.69 Second, it argues that

if the email was not a vote, then it was a written consent.70

65
 JX 435 (“Compl.”) ¶¶ 35–61.
66
 PTO ¶ 2.
67
 8 Del. C. § 225(a)
68
 Genger v. TR Inv’rs, LLC, 26 A.3d 180, 199 (Del. 2011).
69
 Pl.’s Pretrial Br. (“PB”) 46.
70
 Id.

 17
 Palisades next argues that the Bäckers breached the Voting Agreement by

failing to appoint Grauman to the open CEO director seat on the Board.71 As the

Voting Agreement contains a stipulation of irreparable harm and a consent to

specific performance provision, Palisades argues Grauman must be appointed to the

Board immediately.72

 Last, Palisades argues that even if D’Addario and Grauman were not elected

to the Board, this Court should invoke its equitable powers to invalidate all actions

undertaken by the Bäckers at the November 15 meeting.73 In this regard, it appears

Palisades is arguing that Bäcker utilized trickery and deceit to call the November 15

meeting and to secure the presence of other Board members at that meeting.

 Defendants counter that the October 28 email relating to D’Addario is neither

a vote nor a written consent under Delaware law.74 They next argue they did not

breach the Voting Agreement because Grauman was validly terminated at the

November 15 meeting and there was no action taken by a stockholder prior to that

meeting to appoint Grauman to the open CEO director seat.75 Last, they argue that

71
 Id. at 58.
72
 Id. at 58–59; JX 7, § 4.3.
73
 PB 52.
74
 Defs.’ Pretrial Br. (“DB”) 31.
75
 Id. at 57–68; D.I. 86 (“Defs.’ Post-Trial Letter Mem.”) 1–3.

 18
equity cannot be invoked to invalidate the actions taken at the contested meeting

because Plaintiff has not provided any evidence that Defendants affirmatively acted

to deceive Plaintiff or prevent any party from exercising its voting rights.76 I address

each contested issue in turn.

 A. D’Addario Was Not Validly Elected to the Board

 The QLess Charter gives the A-1 Preferred Stockholders the exclusive right

to fill the Series A-1 Director seat.77 The Charter provides two mechanisms for the

A-1 Preferred Stockholders to exercise that right: “by vote or written consent in lieu

of a meeting . . . .”78 While the QLess Bylaws allow Board vacancies to be filled by

a majority vote of the directors, the Charter is unequivocal that each class of

stockholders has an exclusive right to appoint specified directors.79 When presented

with a conflict or inconsistency between the documents, as required by the DGCL,

the Bylaws make clear that the Charter controls.80

76
 DB 43–47.
77
 Charter § 3.2.
78
 Id.
79
 Compare Bylaws § 3.2 with Charter § 3.2.
80
 See Bylaws § 3.2 (prefacing the Board vacancy provision with, “[u]nless otherwise
provided in the corporation’s certificate of incorporation . . .”); 8 Del. C. § 109(b).

 19
 1. The October 28 Email Is Not a Vote

 Plaintiff would have me find that Arnold’s October 28 email, where he asked

Alderton to prepare a stockholder consent for Altos to elect D’Addario to the Board,

actually reflects a vote of the Series A-1 stockholders to that effect. To state the

conclusion succinctly, an email requesting that QLess counsel take action to

facilitate a stockholder consent is not a stockholder “vote” under our law. The

DGCL is clear that stockholders vote at meetings.81 Palisades has not attempted to

argue there was a meeting of the Series A-1 Preferred stockholders where votes were

cast to seat the Series A-1 Director. Instead, it cites to case law it claims supports

the proposition that an email can constitute a vote.82 The cases cited by Plaintiff for

that proposition are inapposite.83

 The DGCL is not alone in providing a basis to conclude there was no vote

with respect to D’Addario. The QLess Charter makes clear that every Series A-1

81
 See 8 Del. C. §§ 212(b), 213(a), (b), 216, 219(a).
82
 PB 46 (citing A & J Capital, Inc. v. Law Office of Krug, 2019 WL 367176, at *8 (Del. Ch.
Jan. 29, 2019); Gassis v. Corkery, 2014 WL 2200319, at *7 (Del. Ch. May 28, 2014)).
83
 A & J Capital, Inc. v. Law Office of Krug involved members of an LLC improperly
removing the manager of that LLC without cause. A & J Capital, 2019 WL 367176, at *1.
While certain “votes” by members were purportedly cast by email, the question of whether
that means of voting was legally effective was not at issue in the case. Id. at *10. And, of
course, the requirements of the DGCL were not in play since the entity involved was a
Delaware LLC. Similarly, Gassis v. Corkery involved a Delaware nonstock, charitable
corporation. Gassis, 2014 WL 2200319, at *1. And the dispute there related to the
contested removal of a director by other directors, not a stockholder vote. Id.

 20
Preferred Stockholder is entitled to vote to elect the Series A-1 Director.84 Plaintiff’s

counsel noted at trial that Altos does not hold 100% of the Series A-1 Preferred

Stock.85 A holding that an email from Altos’s general counsel constituted a “vote”

of the entire Series A-1 Preferred would disregard the minority Series A-1

shareholders’ right to exercise their franchise. While Altos’s status as majority

Series A-1 stockholder would render the results of the vote a foregone conclusion,

that fact does not alter the right of the minority Series A-1 stockholders to cast a vote

for their Board designee should they so choose.86

 2. The October 28 Email Is Not a Written Consent

 Palisades next claims the October 28 email sent by Altos’s general counsel is

a written consent.87 The language of that email clearly shows otherwise. In the

email, Altos’s general counsel writes, “[w]ould you please draft and circulate the

necessary stockholder consent to elect Paul D’Addario . . . to the QLess Board as

the Altos designee? We would like to fill the vacancy left by [Nam’s] resignation

84
 Charter § 3.2.
85
 Tr. 9:23–10:24.
86
 Charter § 3.2; see Airgas, Inc. v. Air Prods. & Chems., Inc., 8 A.3d 1182, 1188
(Del. 2010) (“If charter or bylaw provisions are unclear, we resolve any doubt in favor of
the stockholders’ electoral rights.”).
87
 PB 46.

 21
with Paul as soon as possible.”88 A request that somebody else draft a written

consent, under any sensible reading, cannot be construed, itself, as a written consent.

 The email also cannot be deemed a consent as a matter of law. 8 Del. C. § 228

governs stockholder consents. While electronic transmissions may suffice to meet

the statutory requirements, such transmissions still must “[set] forth the action so

taken” by the stockholder giving the consent.89 Section 228’s technical requirements

must be “strictly complied with[,]” even in the case of a controlling stockholder.90

Thus, although the intent to act may have been clear, the formalities embedded in

Section 228 still must be followed.91 The October 28 email did not comply with

those formalities because it did not “set forth the action so taken”; it merely

expressed a request that certain action be taken.92 A mere expression of intent,

without executory language, is not a written consent.

88
 JX 225 (emphasis added).
89
 8 Del. C. §§ 228(a), (d) (emphasis added).
90
 Espinoza v. Zuckerberg, 124 A.3d 47, 57 (Del. Ch. 2015).
91
 Id. at 64.
92
 8 Del. C. § 228(a) (emphasis added); JX 225.

 22
 B. QLess’s Corporate Documents Lack Clarity With Respect to the
 Authorized Size of the Board

 8 Del. C. § 141(b) provides that “[t]he number of directors shall be fixed by,

or in the manner provided in, the bylaws, unless the certificate of incorporation fixes

the number of directors . . . .”93 QLess’s Charter does not set the number of directors;

it only provides that the common and preferred stockholders shall be entitled to elect

certain directors.94 In the absence of direction in the Charter, the Court must look to

the Bylaws.95

 Section 3.1 of the Bylaws states, “[t]he number of directors that shall

constitute the whole Board of Directors . . . shall [] be determined from time to time

by resolution of the Board of Directors or by the stockholders at the annual meeting

of the stockholders, except as provided in Section 3.2 of this Article . . . .”96

Section 3.2 provides, “vacancies and newly created directorships resulting from any

increase in the authorized number of directors may be filled by a majority of the

directors then in office . . . and the directors so chosen shall hold office until the next

93
 8 Del. C. § 141(b).
94
 Charter § 3.2. As noted earlier, each preferred class is entitled to elect one director, with
the common stockholders entitled to elect two. Id.
95
 Neither party substantively addressed how the Bylaws govern director appointments in
their briefing or at trial.
96
 Bylaws § 3.1 (emphasis added).

 23
annual election and until their successors are duly elected and shall qualify, unless

sooner displaced.”97

 There is no evidence in the record that, at any point, an annual stockholder

meeting was held to set the size of the Board. The Bylaws allow that the size of the

Board may also be set by Board “resolution.”98 But, again, the parties’ trial

presentations paid no attention to this requirement. Instead, they focused their

analysis on the provisions of the Voting Agreement and assumed that the provisions

in that agreement addressing expansion of the Board were valid.99 I, therefore, do

the same.100

 C. The Voting Agreement and the CEO Director Seat

 Section 1.1 of the Voting Agreement requires its signatories to vote their

shares “in whatever manner as shall be necessary” to expand the Board to six

members within eighteen months of Bäcker’s termination as CEO.101 Section 1.2 of

97
 Bylaws § 3.2.
98
 Bylaws § 3.1.
99
 The Voting Agreement authorizes an expansion of the Board to either five or six
members. Voting Agreement §§ 1.1, 1.2.
100
 While it is unclear if the Voting Agreement is consistent with 8 Del. C. § 141(b), neither
party has questioned the agreement’s validity. The Court, therefore, assumes, without
deciding, that the Voting Agreement is consistent with the DGCL, the Charter and the
Bylaws.
101
 Voting Agreement § 1.1. If the parties decide not to expand the Board during this
eighteen-month period, the Board remains at five directors. Id.

 24
the Voting Agreement obligates the signatories to “vote, or cause to be voted, all

Shares owned by such Stockholder . . . in whatever manner as shall be necessary to

ensure that . . . the following persons shall be elected to the Board: . . . [f]rom after

a Bäcker Termination Event, the Company’s Chief Executive Officer . . . .” 102

Assuming entering into this agreement was a valid act of the QLess shareholders to

authorize an expansion of the Board, the question, then, is how any such expansion

is to be executed.

 The Voting Agreement calls for an expansion of the Board, as specified

therein, to be effectuated by stockholders voting their shares.103 There is no evidence

in the record that any QLess stockholder voted its shares to expand the Board prior

to the November 15 meeting.104 The Bylaws, as mentioned, mandate that any Board

expansion be effected by stockholder vote at an annual meeting or by Board

102
 Voting Agreement § 1.2.
103
 Voting Agreement § 1.1 (“Each Stockholder agrees to vote, or cause to be voted, all
Shares . . . from time to time and at all times, in whatever manner as shall be necessary to
ensure that the size of the Board shall be set and remain at five (5) directors.
Notwithstanding the foregoing, in the event . . . [of] a ‘Bäcker Termination Event,’ each
Stockholder agrees to vote, or cause to be voted, all Shares . . . from time to time during
the eighteen (18) month period following a Bäcker Termination Event . . . to ensure that
the size of the Board shall be set and remain at six (6) directors.”).
104
 The parties, again, gave short shift to the mechanics of the Voting Agreement in their
arguments. It is, therefore, far from clear how any party breached by not voting their shares
when no party formally requested such a vote (assuming the Voting Agreement was
triggered).

 25
“resolution.”105 It further provides that any Board vacancy properly created can be

filled by Board resolution unless otherwise provided for in the Charter.106

 It appears from the evidence that at least a majority of the QLess Board

believed Grauman had been appointed to the Board prior to the November 15

meeting, and stated as much in writing.107 Whether these expressions are sufficient

to constitute a Board “resolution,” as referenced (but not defined) in the Bylaws,

however, was not addressed by the parties in their briefing or at trial. 108 The only

105
 Bylaws § 3.1. Apparently, the QLess Charter, Bylaws and Voting Agreement were
drafted based on model documents provided by the National Venture Capital Association.
Alderton Dep. 14:20–16:6. While I appreciate that startup companies frequently lack the
resources or inclination to draft constitutive documents from scratch, and that model
documents can be important resources for these companies, blind reliance on forms,
without any effort to harmonize them, can be problematic. Such is the case here. QLess’s
constitutive documents were haphazardly slapped together. This sloppiness has made what
is frequently a straightforward exercise of contract construction substantially more
difficult.
106
 Bylaws § 3.2.
107
 See JX 298 (Anderson noting on 11/14 “[w]ith Kevin [Grauman] added to board, 3:2 is
good for now”; JX 224 at 1 (Bäcker expressing his belief that Grauman had been added to
the Board, per his request).
108
 The lack of guidance offered by the parties on the inner workings of the QLess
constitutive documents has been frustrating. This Court requested and received post-trial
submissions that did clarify some of the gaps left by the parties’ briefs and trial arguments,
albeit on issues that ultimately are not relevant to the outcome. See D.I. 84, D.I. 86, D.I. 87,
D.I. 96, D.I. 110 and D.I. 101. But the parties have offered virtually no guidance with
respect to other key issues, including: (1) whether the Voting Agreement conforms with
the requirements of 8 Del. C. § 141(b); (2) how the Company’s Charter, Bylaws and Voting
Agreement interact and operate; (3) what constitutes a “resolution” of the Board based on
QLess’s past practices, or otherwise, and whether any such resolution would have to be
unanimous; and (4) exactly how the CEO director seat was to be filled by the Voting
Agreement’s signatories. In the interest of proceeding expeditiously in a case that is
 26
evidence in the record of a QLess Board vacancy being created and filled was

Markman’s appointment to the Board by a formal, executed “Unanimous Written

Consent of the Board of Directors.”109 With that in mind, I would hesitate to find

less formal actions sufficed to evidence a Board “resolution” that Grauman be seated

to fill the newly created CEO director position on the Board in advance of the

November 15 meeting. For reasons discussed below, however, I need not decide the

issue.

 D. The Actions Taken at the November 15 Meeting Are Invalid as a Matter
 of Equity

 Palisades last argues that, even if D’Addario or Grauman were not validly

elected or appointed to the QLess Board, equity requires that the Court declare the

actions taken by the Bäckers at the November 15 meeting void.110 Specifically, it

maintains that the Bäckers acted inequitably by formulating a secret plan, after

Markman’s resignation, to seize control of QLess at the November 15 meeting, and

then by securing Anderson’s presence at that meeting by means of deception.111

summary by statute, and because I have determined that the case can be decided as a matter
of equity, I have elected not to request yet another round of briefing.
109
 JX 11.
110
 PB 52.
111
 Tr. 47:20–48:19; D.I. 84 Pl.’s Post-Trial Letter Mem. at 6–7. With the exception of
actions to amend the Bylaws, the QLess Bylaws require no advance notice of “the business
to be transacted at, nor the purpose of, any regular or special meeting of the Board of
Directors.” Thus, Plaintiff must ground its charge that the Bäckers acted improperly
 27
 It is bedrock doctrine that this Court will not sanction inequitable action by

corporate fiduciaries simply because the act is legally authorized.112 In this vein,

corporate acts are voidable when “board action [is] carried out by means of

deception . . . .”113 As our case law makes clear, however, there must be some

affirmative deception before equity will intervene; if the Bäckers had simply acted

in secret to plot their boardroom coup d’état without any affirmative action to

mislead other members of the Board, Plaintiff’s call to equity would rest on softer

ground.114

 But that is not what Defendants did. To be sure, Defendants did nothing to

interfere with Altos’s right to fill the Series A-1 vacancy on the Board.115 Altos was

leading up to, and at, the November 15 meeting in equity rather than contract. Bylaws
§ 3.7.
112
 Schnell v. Chris-Craft Indus., Inc., 285 A.2d 437, 439–40 (Del. 1971).
113
 Klaassen v. Allegro Dev. Corp., 106 A.3d 1035, 1047 (Del. 2014).
114
 See Klaassen, 106 A.3d at 1047; Koch v. Stearn, 1992 WL 181717, at *4 (Del. Ch.
July 28, 1992) (overruled on other grounds Klaassen, 106 A.3d at 1047); Fogel v.
U.S. Energy Sys., Inc., 2007 WL 4438978, at *3 (Del. Ch. Dec. 13, 2007) (overruled on
other grounds Klaassen, 106 A.3d at 1047); Hockessin Cmty. Ctr. v. Swift, 59 A.3d 437,
458 (Del. Ch. 2012).
115
 See Nam Dep. 138:7–13 (Q: What, if anything, did [Bäcker] do to prevent Altos from
delivering a stockholder written consent appointing Paul D’Addario to the board of QLess?
A: Nothing. I don’t think Alex could do anything for or against such a motion.); Alderton
Dep. 211:20–23 (Q: What, if anything, did [Bäcker] do to prevent Altos from signing and
delivering a stockholder consent? A: Nothing to my knowledge); Anderson Dep. 133:22–
24 (same).

 28
the recipient of some erroneous legal advice and Bäcker sat silent as a beneficiary

of the misinformation. If that were the end of the story, there would be no basis to

invoke equity. But the Bäckers did not stay silent in all matters related to the

November 15 meeting. Instead, Bäcker affirmatively misrepresented to Anderson

and others that he wanted Grauman on the Board, and that he assumed Grauman had

already joined the Board, noting, “Kevin [Grauman] is on the thread, assuming [the

Board] now includes him, which I requested it does.”116 Ricardo responded that

Bäcker’s message “[l]ooks good to me.”117 When Grauman circulated a “high-level

agenda” for the November 15 meeting, Bäcker responded by thanking him and

asking him to “circulate any proposed resolutions,” further giving the impression

that Bäcker had no issue with Grauman joining the Board.118 On the day before the

contested meeting, Bäcker emailed Grauman, copying the QLess Board, requesting

that Grauman circulate board materials “so that we may all do our homework and be

116
 JX 224 at 1. See JX 500 (Nam noting, “[w]hen I did speak to [Bäcker] about a week
ago, I specifically asked him how he thought Kevin was doing. I also asked him how the
relationship was between him and [Grauman]. He said everything was fine.”). Grauman
also understood this email to mean he was now a member of the Board. Grauman Dep.
52:11–53:5.
117
 JX 224 at 1.
118
 JX 293 at 3.

 29
prepared to spend our time together most productively,” again giving the impression

that Bäcker approved of Grauman’s Board membership.119

 When Alderton circulated draft Board resolutions that would formalize

Grauman’s appointment to the Board, as requested by Grauman and Bäcker, neither

Ricardo nor Bäcker gave any indication that their position had changed.120 After

having affirmatively represented to Anderson (and Markman) that Defendants

supported Grauman’s appointment to the Board, keeping mum as they planned their

ambush was inequitable.121 If Anderson had known of Defendants’ change of plans,

he would have refused to participate in the meeting, defeating a quorum and

thwarting the coup.122 As Anderson’s presence at the meeting was secured under

deliberately false pretenses, any action taken at that meeting is void.123

119
 JX 296 (emphasis added).
120
 See JX 318.
121
 See Klaassen, 106 A.3d at 1046 (“Our courts do not approve the use of deception as a
means by which to conduct a Delaware corporation’s affairs . . . .”); Koch, 1992
WL 181717, at *4 (“The validity of the board action taken [at the meeting] . . . depends
upon whether [Plaintiff] was tricked or deceived into attending the meeting.”) (overruled
on other grounds Klaassen, 106 A.3d at 1047).
122
 Anderson Dep. 105:23–109:17 (Discussing that he considered not attending the meeting
to defeat a quorum, but decided against it because he believed Bäcker did not control a
Board majority.).
123
 Klaassen, 106 A.3d at 1046. Defendants have not raised any equitable defenses that
would save the contested Board actions.

 30
 III. CONCLUSION

 For the foregoing reasons, all actions taken at the contested November 15

meeting are void. The QLess Board comprises Alex Bäcker and Ricardo Bäcker as

common directors and Jeff Anderson as the Series A Director. The Series A-1

Director, independent director and CEO director seats remain vacant. Kevin

Grauman remains as QLess’s CEO. The parties shall confer and submit a

conforming order and final judgment within ten (10) days.

 31